In the Matter of **ROBERTSON CLASS PLAINTIFFS and National Basketball Players Association,**

and

**National Basketball Association, Lawrence O'Brien, and Seattle Supersonics,**

New York Knickerbockers, Intervenors.

No. 70 Civ. 1526(RLC).

United States District Court, S. D. New York.

Sept. 19, 1979.

---

Weil, Gotshal & Manges, New York City, for the National Basketball Players Association; James W. Quinn and Irwin H. Warren, New York City, of counsel.

Proskauer, Rose, Goetz & Mendelsohn, New York City, Jeffrey A. Mishkin of counsel, and David J. Stern, General Counsel, NBA, New York City, for the National Basketball Association.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for the New York Basketball Club; Louis Nizer, Paul Martinson, Sidney Bluming, and Martin Stein, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

*The Nature of the Proceedings*

Because the parties at times seem to misconceive what this proceeding involves, it should be emphasized at the outset that all claims in *Robertson v. NBA*, 72 F.R.D. 64 (S.D.N.Y.1976) (Carter, J.), *aff'd*, 556 F.2d 682 (2d Cir. 1977), were dismissed with prejudice pursuant to a Stipulation and Settlement Agreement ("Agreement") entered into by the parties and approved by the court and that none of those claims are implicated in the instant adjudication. The sole issue before the court concerns the meaning and effect of paragraph 2C of the Agreement.

Paragraph 2C of the Agreement provides for the continuation until the end of 1980–81 National Basketball Association ("NBA") playing season of "the compensation rule currently applicable in the NBA" when a veteran free agent signs a player contract with an NBA team other than the team for which he had previously played. Under the compensation rule the two teams in question seek to reach agreement as to what compensation the club signing the player will pay the old team for the loss of the player's services. If they are unable to agree, the Commissioner of the NBA is then empowered to take jurisdiction of the dispute and is authorized to dispose of it by either making no award to the old team or by awarding compensation in the form of assignment of a player contract or contracts, and/or assignment of a college draft choice or choices, and/or cash. Paragraph 2C(1) states that the purpose of the compensation rule is to make whole the team losing the veteran free agent and not to penalize the exercise of the player's right.

A Special Master is accorded exclusive jurisdiction to enforce the terms of the Agreement, subject to review by the court. The instant proceeding is a petition, brought pursuant to paragraph 8(e) of the Agreement, by the National Basketball Players Association ("NBPA" or "players") and the New York Basketball Club ("New York") to review the decision of the Special Master refusing to set aside an award made by Commissioner Lawrence O'Brien to the Seattle Basketball Club ("Seattle") in a dispute over the amount of compensation Seattle should receive from New York as compensation for the latter's signing of Marvin Webster.

*The Background Facts in the Dispute*

Marvin Webster, who had fulfilled all obligations under his contract with Seattle, became a veteran free agent at the close of the 1977–78 NBA basketball season. As

indicated, Webster was entitled to negotiate with any team in the NBA. However, on signing with any club other than Seattle, the compensation rule and procedures set out above would become operative. On August 23, 1978, Seattle offered Webster a 5 year no-cut contract at $400,000 per year and indicated a willingness to match any confirmed offer made by any other NBA team. When informed that New York had offered a 5 year no-cut contract at $600,000 per year, Seattle agreed to meet those terms. Negotiations, however, broke down over some subsidiary issue, and Webster signed a contract with New York. Seattle and New York unsuccessfully attempted to resolve the issue of compensation, and on September 15, 1978, Commissioner O'Brien assumed jurisdiction of the dispute.

The parties made various written submissions to the Commissioner outlining their positions and agreed to have the Commissioner determine the matter on these submissions without a hearing. As had been his practice in the past, the Commissioner appointed an impartial expert—Joseph Axelson, President and General Manager of Kansas City Basketball Club—and asked Axelson to rate Webster on basic playing skills (shooting, rebounding, ball handling, defense, passing, quickness, etc.) and to make similar ratings of other players on the New York team: James Cleamons, Glen Gondrezick, Spencer Haywood, Toby Knight, Bob McAdoo, James McWilliams, Lonnie Shelton and Ray Williams.

Axelson performed the assigned task and filed a report with the Commissioner on September 22, 1978 (see Ex. 17, Comp. P.[1]). Under Axelson's rating each skill measured was given a numerical value of 1–10 or 1–5, for a overall maximum total value of 75. Shooting, rebounding, ball handling and defense were regarded by Axelson as the most important skills and were given a weighted value double that of the other skills. Based on these ratings, Axelson gave Webster a score of 50 in basic skills (shooting 6, re-

bounding 8, speed 4, quickness 3, play without the ball 3, team player 4, agility 3, take charge 4, defense 7, passing 3, ball handling 5). *Ibid.* The ratings were based upon play in the 1977–78 season. Of 58 NBA players whom Axelson classified as centers, Webster was ranked behind 6 players including Abdul Jabbar, Walton, Lanier, Gilmore, McAdoo and Cowens, alongside Paultz, Issel, Parish and Nater and ahead of 16 named and 31 unnamed other players.

The Axelson ratings were immediately served on both parties, affording them the opportunity to comment prior to the Commissioner's ruling. Seattle disputed the ratings. New York, however, was in substantial agreement with them, except New York argued that Webster may have been overrated because Axelson's evaluations were based on only one playing season—1977–1978—and did not take into account Webster's medical problems.

*The Commissioner's Opinion and Award*

On September 29, 1978, the Commissioner filed his opinion and award assigning Lonnie Shelton's contract and New York's first round 1979 college draft pick to Seattle[2] and in addition ordering New York to pay Seattle $450,000 in cash. The Commissioner stated that "the clearest evidence of Webster's abilities, and his value to Seattle, is his performance throughout the 1977–78 season. . . ." (Commissioner's Op. & Award, p. 18). While conceding that NBA statistics "may not place Webster" in a superstar category, he characterized Webster's 1977–78 statistics as "impressive and demonstrate that Webster possesses superior skills, particularly in the areas of rebounds and blocked shots." *Id.* at 19. Moreover, apparently accepting the concept of the center as the dominant force in NBA competition, the Commissioner reasoned that "especially in the case of a center," statistics are not the sole measure of a player's value, and a superior center imparts "a special quality and force that rare-

---

**1.** This reference is to the record made in the compensation proceedings before the Commissioner.

**2.** This was acquired by New York from the New Jersey NBA club in a settlement of a territorial dispute between the two clubs.

ly attaches to having extraordinary talent at the other positions." *Ibid.* Webster's value was also held to be confirmed by the magnitude of the salary offers both teams made to him, and his final contract insured Webster a salary "in excess of that received by all but a handful of other" NBA players. *Id.* at 20.

In making the award, the Commissioner refused to take into account Seattle's claim that Webster's loss would result in diminished ticket sales, nor did he regard New York's wealth as an appropriate yardstick. Seattle had indicated that Shelton was the only player on the New York team aside from McAdoo whose playing skills would fit in or contribute to Seattle's style of play. The Commissioner considered assignment of Bob McAdoo to Seattle excessive compensation, and discounted New York's suggestion that Webster's role could be adequately filled by Shelton alone. Moreover, the Axelson ratings were held not to support a comparison between Webster and Shelton because Axelson's rating system was not designed to compare players at different positions and only measured basic skills without reference to other factors which might bear on a player's value to a team.

The Commissioner did not consider Shelton and New York's 1979 first round college draft choice sufficient compensation for Webster's loss. For these reasons, the Commissioner concluded that the assignment of Shelton's contract, New York's first round 1979 draft pick and $450,000 in cash would amount to adequate compensation. The Commissioner did not discuss in his opinion the value he placed on the first round draft choice, nor did he explain how he arrived at the cash aspect of the award.

*Proceedings Before the Special Master*

The NBPA, which had refused to take part in the proceedings before the Commissioner, filed a petition with the Special Master pursuant to paragraph 8(a) of the Agreement seeking to have the award set aside as a penalty within the meaning of paragraph 2C(1) of the Agreement.

The Special Master held four days of hearings. New York was allowed to partic-

ipate in this proceeding as a party challenging the Commissioner's award over the strenuous objections of the NBA. The Special Master's stated rationale for the conclusion that New York as well as Seattle should be allowed to intervene in the proceeding was based on the view that where an award is a penalty, it damages both the interests of the players and the team required to pay the award and vacature of an award damages the team to whom the award was made. (Report of Special Master, p. 8).

The Special Master characterized the NBPA's refusal to participate in the compensation proceedings before the Commissioner as "incomprehensible." *Id.* at 10. He could not read paragraph 2C(1) of the Agreement "as envisaging that the party most interested in implementing the anti-penalty clause was expected to remain aloof from the very proceedings in which the Commissioner is exercising his discretion and then resort to a subsequent *de novo* hearing to attack the award as a penalty. Such a procedure is wasteful of time and money . . . ." *Id.* at 10–11. While not suggesting an obligation of NBPA to participate in proceedings before the Commissioner or holding that its right to attack a compensation award would be waived by a failure to participate in the compensation proceedings, the Special Master indicated that any evidence which could have been (but was not) presented to the Commissioner would be excluded in future proceedings before him.

He rejected the NBA's contention that his review was limited to the record before the Commissioner, and he regarded consideration of past awards by the Commissioner as an appropriate basis for evaluating whether the instant award fell within or without the acceptable parameters established by the Agreement.

The Special Master made thorough and comprehensive findings of fact and filed a thoughtful report on the merits of the controversy. He summarized the negotiations between Webster and Seattle, and between the two clubs, their arguments before the

Commissioner, the Axelson ratings, the testimony adduced at the hearing before him and the Commissioner's analysis and award.

In summarizing the testimony in the proceedings before the Commissioner and before him, the Special Master found the record not supportive of the Commissioner's conclusion that Webster's statistics were impressive. He concluded that the Commissioner gave more weight to the dominant center theory than it deserves; that insofar as Webster may be classified as a dominant center, his dominance was limited to defensive skills. He conceded, however, that Webster's full value to Seattle was substantially higher than the statistics indicated and that Webster had contributed a great deal to the success of Seattle in his last season with the club. The salary factor was considered significant in terms of Webster's worth since Seattle was willing to match the New York offer.

The Special Master found particularly troubling the far more substantial compensation awarded Seattle for Webster's loss than the Commissioner had awarded less than a month previously to San Francisco for its loss of Rick Barry to Houston. The Special Master concluded that there was nothing in the record to support the view that "a center with one year of effective play in a defensive role is twice as valuable as a forward" of Barry's stature. *Id.* at 40. The Special Master conceded that Seattle's and New York's strongly felt need for an excellent starting center justified higher compensation to Seattle for Webster's loss than was awarded to San Francisco in the Barry case. Yet he found the divergence between the two awards too great for reconciliation of one to the other, and concluded that the Webster award was excessive.

While agreeing that the award would chill the market for veteran free agents, the Special Master did not consider that factor sufficient to make the award a penalty. He held that he could not set aside an award unless (a) there is substantial evidence that the Commissioner intended to make the team more than whole or (b) the award is demonstratively so clearly excessive that it must be attributed either to intent or gross error of judgment. Accordingly, he denied the petition. NBPA and New York brought the matter here for review.

*Preliminary Considerations*

Two procedural issues must be disposed of before the merits of the controversy are reached—New York's right to challenge the Commissioner's award under the Agreement and the Special Master's ruling that in all future proceedings he will exclude evidence which the players could have but did not present to the Commissioner.

*New York's Right to Challenge the Commissioner's Award*

██ The Agreement, it must be emphasized, is between the NBPA on one side and the NBA and its member clubs on the other. Jurisdiction is accordingly limited to disputes between the NBPA and/or NBA players and the NBA and/or NBA clubs. The Agreement provides neither the Special Master nor the court with jurisdiction to resolve disputes among players, among NBA clubs or between NBA clubs and the NBA. While it is certainly true, as the Special Master indicated, that a determination of a controversy concerning a compensation award affects the clubs involved as well as the players, that consequence does not sanction the exercise of power which the parties never surrendered under the Agreement. These considerations make clear that the NBA's position that the New York club lacks standing to challenge the award in this proceeding—or perhaps more precisely that the court has no jurisdiction under the Agreement over a dispute between New York and the Commissioner—is eminently correct.

When the issue was first raised before me, it was my view that while New York could not initiate proceedings attacking the Commissioner's award, it could, once such proceedings had been instituted by the NBPA, intervene as *amicus curiae*. Further reflection, however, now convinces me that that view is flawed. The role of the court is to see to it that the parties who as signatories have entered into a viable con-

**664**

tract are kept to their bargain. That bargain is that the NBA and its member clubs will abide by the terms of the Agreement in their dealings with the players and similarly that the NBPA and the players will conform to the Agreement in dealing with the NBA and its member clubs. When a party seeks to move to the opposite side of the bargaining table, it cannot invoke paragraph 8 of the Agreement since such disputes are no longer between the players and the NBA—the only disputes the Agreement authorizes the Special Master and the court to resolve.[3] Lacking jurisdiction over the petition, allowing New York to intervene was error, and its petition to set aside the Commissioner's award must be dismissed.

*The Threat of Sanctions On the Player's Failure to Participate in Compensation Proceedings*

██ The compensation rule and the power of the Commissioner to take "full, complete and final jurisdiction" of any dispute involving two or more NBA member teams were operative procedures and practices before the Agreement came into being.

In an April 26, 1974 letter, Walter Kennedy, the then NBA Commissioner, described to Samuel Schulman, a party interested in the outcome of this proceeding, the compensation rule, its purposes and the Commissioner's role. The letter states that the "primary objective of the NBA is to present a schedule of basketball games among teams which so far as possible, are competitive with one another on the basketball court." (Exhibit 1, Mem. in Support of Players' Objections). Thus, the letter continues, when a veteran free agent signs with another NBA team, "it has been and will be the duty of the two teams involved to assess the impact which the signing has upon the primary objective of the NBA. This includes assessing not only the immediate effect of the movement of a player

from one team to another on each of the two teams and their respective players, but also the possibility that the uncompensated loss of a particular player might discourage the financial investments which teams in the NBA are expected to make in securing and developing talented basketball players. The system has worked well, and teams involved in such player movement . . . have heretofore been able to resolve the compensation question without my participation." *Ibid.* The letter goes on to state that if differences cannot be resolved by the two teams, the disputed cases come before the Commissioner who under paragraph 24(c) of the NBA constitution has "full, complete and final jurisdiction of any dispute involving two or more Members of the Association."

It is clear, therefore, that the Commissioner in resolving a dispute among NBA clubs is exercising power apart from any authority having its genesis in the Agreement. While the Agreement legitimates the continuation of current compensation practices until the end of the 1980–81 NBA season, seeks to define the limits of the Commissioner's authority and provides a forum for the players to challenge an award that exceeds stated proscriptions, the Agreement did not create the rule or establish the compensation proceedings. At the stage of the Commissioner's intervention, the dispute is one between member NBA teams. It has not yet ripened into a dispute between the players and the NBA which implicates the Agreement. Indeed, it may never reach that posture. Of course, what the Commissioner determines about compensation affects the players as well as the main disputants. Yet that factor has as little relevance to a requirement that the players participate in the Commissioner's hearing as it did in respect to New York's just discussed right to challenge the Commissioner's award in this proceeding. Prior to the Agreement, the players never partici-

---

**3.** This is not to imply that a member club may not seek to intervene in a proceeding before the Special Master in support of the Commissioner's ruling. In that instance the dispute remains in its totality a dispute between the play-

ers and the NBA, and no issue of jurisdiction arises. The Special Master, of course, is not required to allow such intervention. The matter is wholly within his discretion.

pated in compensation proceedings before the Commissioner, and there is nothing in the Agreement to warrant a holding that the parties contemplated a break with the past.

Indeed, until the issue was raised by the Special Master *sua sponte* in the Menninger proceedings, there was no contemplation or suggestion that the NBPA should or would be a party to the compensation proceedings. Once the suggestion was made, the Commissioner thereafter was quick to follow through and invite the NBPA to make submissions or presentations to him. However appealing such participation may appear to be in terms of economy and common sense, to require the players on penalty of sanctions to participate in the Commissioner's in-house compensation proceedings is to misconceive and distort the respective roles of the players and the Commissioner as well as any subsequent proceeding under the terms of the Agreement.

The only interest the players have in what the Commissioner determines in the way of an award is whether it constitutes a penalty within the meaning of paragraph 2C(1). While the Commissioner arbitrates disputes among member NBA clubs, that is not his role in dealing with the players. By introducing the concept of player participation in the Commissioner's proceedings, the Special Master has given credence to some NBA insupportable procedural claims—that the players should be barred from proceeding before him *de novo* and that his review be limited to evidence before the Commissioner. To describe the proceedings before the Special Master as hearings *de novo* is a misnomer and to argue that such proceedings are limited to a review of the evidence before the Commissioner is to misconceive the nature of the Special Master's role. The Agreement provides a forum for the players to seek a modification of an award of compensation arguably at issue with the purpose set out in paragraph 2C(1). The players and the NBA are before the Special Master for a determination as to whether the Commissioner's award is or is not a penalty. That constitutes a proceeding *ab initio* under the Agreement—a first-time

test of the validity of the award within the meaning of the Agreement.

The right to the players to invoke the Agreement to challenge an award cannot be predicated on their prior participation in the Commissioner's proceedings; nor can their evidentiary proof be restricted to what may have been or could have been before the Commissioner. The Special Master's views in this regard are therefore disapproved and rejected.

*The Merits of the Award*

I

■ The players argue that the only issue before the court is whether the Special Master's findings are "clearly erroneous," citing *Arrow Distilleries, Inc. (Michigan) v. Arrow Distilleries, Inc.*, 117 F.2d 636, 638–39 (7th Cir.), *cert. denied*, 314 U.S. 633, 62 S.Ct. 67, 86 L.Ed. 508 (1941). They contend that the Special Master's finding that the award is excessive requires that it be set aside.

The NBA contends that while the Special Master's findings are at fault, his ultimate conclusion is correct. They argue that in applying an intent standard as the yardstick for overturn of the Commissioner's holding, the Special Master was applying a concept well settled in the review of arbitration awards. Moreover, they urge the Agreement placed responsibility for compensation awards on the Commissioner and gave him "sole discretion" to make such determinations. Accordingly, the NBA asserts the abuse of discretion standard applied by the Special Master is the appropriate yardstick to be applied on review.

Our inquiry should begin with the Agreement. Paragraph 8(c)(11) provides that the court shall accept the Special Master's findings unless clearly erroneous and his recommendations for relief "unless based on clearly erroneous findings of fact, incorrect application of the law or abuse of discretion."

The Agreement seeks to apply to court review of the Special Master's findings the same criteria applicable on appellate review of a trial court's determinations. See, e. g.,

*Carrion v. Yeshiva University*, 535 F.2d 722, 728 (2d Cir. 1976). The unless clearly erroneous standard, however, is applied only as to findings of a trial judge based on the rejection or acceptance of a witness' recollection and credibility. *Ibid.* There were only six witnesses who personally testified before the Special Master. Michael Burke's and Lawrence O'Brien's testimony did not concern the merits of the award. Samuel Schulman was questioned about statements he made in regard to Shelton's value to Seattle and David DeBusschere, Patrick Williams and Axelson discussed Webster's value and skills. Except for the Special Master's evaluation of Williams' testimony, credibility and recollection played no part in the framework of his findings. Yet all of his findings in respect to these witnesses were testimonial, and the inferences to be drawn on review of testimonial findings are subject to more searching review than is the case where credibility of a witness is involved. *American Tobacco Co. v. The Katingo Hadjipatera*, 194 F.2d 449, 451 (2d Cir. 1951), *cert. denied*, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952). The remainder of the record relied on by the Special Master consisted of documentary evidence. Since such evidence is as available to me for inspection on review as it was to the Special Master, here too a stricter standard of review becomes operative. See *Fur Information and Fashion Council, Inc. v. E. F. Timme & Son, Inc.*, 501 F.2d 1048, 1050–51 (2d Cir.), *cert. denied*, 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974). For these reasons I have made an independent examination of the entire record to determine for myself the validity of the Special Master's findings, and on the basis of that review I am satisfied that his findings are fully supported by the record in this case.

## II

Seattle certainly showed that it placed as great a value on keeping Webster as New York did in wanting to sign him by Seattle's willingness to meet New York's more generous contract terms. Every player in the NBA is at the top of the list of talented basketball players. Webster had demonstrated a potential for outstanding play in the 1977–78 season with Seattle—particularly in regard to defensive skills—but that potential had not, as of the close of the 1977–78 season, yet come to full fruition. It remained a future promise. He had fulfilled the role of a team player at Seattle in 1977–78 very well indeed, but his record had not demonstrated a capacity to take charge, as for example Barry had shown in his NBA career. The Commissioner evaluated Webster's value to Seattle based on his performance during the preceding season. In all other award cases the player's entire NBA career was considered.

Under Axelson's rating based on NBA statistics on basic skills, Webster was given a rating of 50. He scored highest in shooting, rebounding, defense and ball handling. A rating of 50 out of a possible 75 is not impressive. NBA seeks to discount statistics in this case, which seems rather odd in view of the fact that in all award cases the Commissioner relies on an expert to evaluate for him the basic skills of the player in question, as well as the skills of players on the new team, since assignment of a player from the new team to the old team may constitute the compensation awarded the old team. Statistics are kept by the NBA, and their purported purpose is to afford some objective indicia of a player's skills and indeed they are the only available objective guides on which comparison of one player to another can be made. While other factors must be taken into account—the usefulness to the team of the particular set of skills involved—the basic skills have to play a large part in compensation award determinations.

■ NBA counsel objects to reliance on the Commissioner's opinions and awards in prior compensation cases for guidance in evaluating the instant award. That objection is devoid of merit. The Commissioner does not write on a clean slate. The Special Master was clearly correct in focusing on the Commissioner's action in Rick Barry's case as a basis for judging the instant award. That award had been made a few

weeks prior to the one at issue here. The argument that each case is so distinct that comparison cannot be safely made is unpersuasive. The Commissioner's approach to decision in prior cases, as well as the nature of the awards previously made provide appropriate yardsticks to test the bona fides under the Agreement of subsequent determinations. This is not a refusal to recognize that each case presents some issue or facet for consideration, not present perhaps in prior cases. Yet after making allowances for these differences, the awards must fall roughly within some cohesive pattern. The Commissioner's objective in this and all prior awards made since the Agreement became operative was the same—to make whole the team losing the player. Thus comparisons with other relevant awards cannot be avoided.

Barry was described by the Commissioner as one of the greatest NBA players, with entitlement to that label through five years of play in the NBA. Barry ranked third highest in scoring and led the league in steals and free throws over his five years of NBA service. He was on the All Star NBA team in each of the five years. The Commissioner described Barry as a "superstar" and the "most important member of the San Francisco team." His 1977–78 season play was described "as possibly Barry's best in the last three years" and the Commissioner concluded Barry was "still" among the game's elite at the forward position.

Williams, the designated expert whose function was to give the Commissioner disinterested advice on Barry's skills and value, reported that San Francisco "has lost the heart of their team" in losing Barry to Houston. His enthusiasm had cooled considerably when he testified before the Special Master, but his later statements can be discounted since they were generated patently from a partisan effort to support the Commissioner's decision, even if that necessitated a departure from an honest appraisal.

Of course the age factor has to be taken into account. Barry was 34 and Webster 27 at the time of the Commissioner's determination in their respective cases, and a seven-year gap certainly between 27 and 34 is a lifetime for a professional basketball player. The physical toll grows increasingly intolerable past age 30. Yet, the Commissioner did not seem to find Barry's age a negative factor. He expressed no anticipation that Barry's skills were threatened with immediate erosion. Instead, the Commissioner described Barry as continuing to be a great player and expressed the belief that he would maintain that status through three additional years.

The dominant center theory clearly influenced the Commissioner's decision here. I agree, however, with the Special Master that the rarity of centers may heighten their value over other positions, but as rare as centers may be, a phenomenal forward like Barry is at least as rare. Moreover, Webster had not at the time of the award last September demonstrated that he qualified for membership in that special fellowship of dominant centers.

The two awards cannot be reconciled. To hold that the loss of a Barry, even taking into account age and the fact that he is not a center, may be sufficiently compensated for by the assignment of the contract of John Lucas and cash payment of $100,000 or in the alternative assignment of Houston's 1979 first round draft choice and $350,000 cash payment, while the loss of a Webster is worth more than double that seems patently incongruous.

Lucas is a 6′3″ guard, then 24 years of age, described as "an excellent player" but one who "would not fulfill the same role on the Golden State team as Barry, a 6′7″ forward." Shelton's skills seem more closely parallel to Webster's than Lucas' to Barry's. Axelson rates Shelton in shooting 7, compared to Webster's 6, in rebounding 6, compared to Webster's 8, in ball handling 4, compared to Webster's 5, in defense 6, compared to Webster's 7, and overall 48 compared to Webster's 50. Axelson indicates that comparison cannot be made of players in different positions. However, Shelton had played both as center and forward which should afford a sounder basis for

comparing him to Webster than comparing Lucas, a guard, to Barry, a forward. In any event, the Commissioner equated Lucas' skills to Barry's and Shelton's skills to Webster's in making the award, and presumably the needs of San Francisco and Seattle respectively, but Seattle's interest in Shelton should have been an ingredient which added to the value of his assignment to Seattle. As indicated earlier, while the Commissioner gave his reasons for his conclusion that assignment of Shelton alone would not make Seattle whole, he placed no value on the first round draft choice, nor did he articulate his reasons for the additional $450,000 cash payment.

■ While the Commissioner's prior awards are proper considerations, neither Webster's value to New York, his record with New York, nor Shelton's showing in Seattle is an appropriate measure of the award's compliance with the Agreement. Evaluation must be made on the basis of factors which were known or should have been known at the time when the award was made.

The Special Master found the award excessive, and I agree. There is nothing in the two awards which would warrant awarding Seattle more than twice as much for the loss of a Webster, whose potential has not been fulfilled, then was awarded to San Francisco for the loss of one of the NBA's greatest players. The age factor might warrant $100,000 to $150,000 more in cash than was awarded to San Francisco, that is Shelton and $200,000 to $250,000 in cash or New York's 1979 first round draft choice and $450,000 but not a determination that is in excess of the alternatives offered for Barry's loss.

### III

Since the Special Master and I agree that the award was excessive and more than makes Seattle whole, the remaining issue is does that conclusion require that the award be set aside?

Interpretation of paragraph 2C(1) of the Agreement set out in pertinent part below will determine the answer to that question. It states:

Under the compensation rule currently applicable in the NBA . . . if the new team and prior team are unable to agree upon the compensation to be paid to the prior team . . . the Commissioner of the NBA, who has full, complete and final jurisdiction of any dispute involving the new team and the prior team, is authorized, but not required, to make an award of compensation to the prior team. The award by the Commissioner may take the form of assignment of Player Contract(s) and/or draft choice(s) and/or cash. *Although the decision of whether to award compensation and, if so, what form of compensation is fair and equitable, lies in the sole discretion of the Commissioner, the purpose of the compensation rule described above is not to serve as a penalty, but is to ensure that a team which loses . . . a player is, to the nearest extent possible, made whole for the loss of such player* (emphasis supplied).

■ The basic objective of contract interpretation must be to determine the intention of the parties from the language employed, *Hartford Accident & Indemnity Co. v. Wesolowski*, 33 N.Y.2d 169, 171–72, 350 N.Y.S.2d 895, 898, 305 N.E.2d 907, 909 (1973), as gleaned from the several provisions of the Agreement. *Laba v. Carey*, 29 N.Y.2d 302, 308, 327 N.Y.S.2d 613, 618, 277 N.E.2d 641, 644 (1971). Courts may not under the guise of interpreting a contract to give effect to the parties' "real" meaning, rewrite the Agreement "if to do so would contradict [its] clearly expressed language . . .," *Rodolitz v. Neptune Paper Products, Inc.*, 22 N.Y.2d 383, 386, 292 N.Y.S.2d 878, 881, 239 N.E.2d 628, 630 (1968) (citations omitted), but are required to adjudicate the parties' rights "according to the unambiguous terms of the contract and therefore must give the words and phrases employed their plain meaning." *Laba v. Carey, supra*, 29 N.Y.2d at 308, 327 N.Y.S.2d at 618, 277 N.E.2d at 644 (citation omitted). Accord, *Central New York Freightways, Inc. v. Deperno*, 60 A.D.2d

750, 400 N.Y.S.2d 946 (4th Dept. 1977); *Allied Chemical Corp. v. Alpha Portland Industries, Inc.,* 58 A.D.2d 975, 397 N.Y.S.2d 480 (4th Dept. 1977).

The paragraph in question seems clear and unambiguous. The first two sentences recite the Commissioner's authority under the NBA constitution to render a final resolution of any dispute among member NBA teams. These provisions in the Agreement provide recognition for the definitive authority of the Commissioner to settle disputes among member NBA teams and make clear that the form of the compensation and decision whether compensation should be awarded is left to the Commissioner's "sole discretion." Thus far, there is, I believe, no dispute among the parties.

The although phrase of the next sentence constitutes a summarization or restatement of the Commissioner's authority recited in the first two sentences already discussed. Then comes the purpose clause which adds another dimension. That clause is meant to constitute an express limitation on the Commissioner's authority. While he has discretion to decide whether and what to award as compensation, in the latter instance his award must conform to the Agreement's stated purpose of the compensation rule, that is, to ensure that the prior team is made whole and not to serve as a penalty. The "sole discretion" language relates only to the Commissioner's whether and what authority in re compensation. He has no discretion in respect of conforming compensation to the stated purpose of the Agreement. Any other construction would make the purpose clause a nullity, which indeed is precisely the result adherence to the Special Master's misconception would entail.

The NBA secured the continuation of the compensation rule, acceptance and recognition of the Commissioner's constitutional authority to arbitrate disputes among member clubs, and to determine the form compensation would take. In return, since freedom of contract of veteran free agents would be affected by any compensation the Commissioner awarded, the purpose and reason for compensation was written into the Agreement to prevent its use to penalize the exercise of the player's right to contract with another team and to restrict the size of the awards to the value of the lost player to his former team. In the event the Commissioner awards compensation in excess of the lost player's value to his old team, the Agreement allows a challenge by the players.

When, as here, such a challenge is made, the parties have given final authority to the Special Master to determine whether the award is a penalty. The Special Master's interpretation would abdicate that responsibility to the Commissioner. The players, of course, contend that the compensation rule *per se* "chills" the market for free exercise of players' right to contract their services. In settling the litigation, the parties agreed to a compromise which maintained the compensation rule under specific restriction. The Special Master's reading of the Agreement would make it extremely difficult, if not impossible, to effectuate 2C(1)'s limitation on the Commissioner's power.

■ NBA counsel argues that "in adopting an 'intent' standard the Special Master was applying a concept that is well settled in the review of arbitration awards." But this is yet another reason why the Special Master's holding cannot stand. Although the Commissioner is indeed an arbitrator vis-a-vis disputing NBA member teams, he holds no such neutral position when NBA action is challenged by the players as vitiating the Agreement. The focus of the Special Master in a hearing of a player challenge to the Commissioner's compensation award is not on the dissatisfaction of one of the affected member's clubs with the Commissioner's ruling, in which case the developed law in respect of the limited scope of review of an arbitrator's determination would be applicable, and such cases as *Board v. Niagara Teachers Association,* 46 N.Y.2d 553, 415 N.Y.S.2d 790, 389 N.E.2d 104 (1979), cited by the NBA, would be controlling. The Special Master, however, is not reviewing the Commissioner's function as final arbitrator of disputes between

member NBA clubs.[4] Rather he is engaged in a totally separate task of assessing a claim that the NBA has not kept to its bargain not to use compensation proceedings to affect adversely the rights of veteran free agents to enter into contracts with clubs other than the team to which they were most recently bound. In that controversy the Commissioner becomes an antagonist, and the role of arbitrator becomes the function of the Special Master.

When Section 8(a) of the Agreement is invoked by the players to challenge a compensation award, they have the burden of proof to establish that the award violates paragraph 2C(1) of the Agreement, and a prima facie infringement is shown by proof that the relative worth of the compensation exceeds the value of the lost player. Once the players make out a prima facie case, the burden then shifts to the NBA to rebut the players' case by proof either of special circumstances or other reasons justifying the Commissioner's generosity to the team losing the player or of evidence that the contested surplusage in value is insignificant. The preponderance of the evidence standard ordinarily applicable, see, e. g., *Barr Rubber Products Co. v. Sun Rubber Co.*, 425 F.2d 1114, 1120 (2d Cir.), *cert. denied*, 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115 (1970); *Edwards v. Mazor Masterpieces, Inc.*, 111 U.S.App.D.C. 202, 204, 295 F.2d 547, 549 (D.C.Cir. 1961); *Systematic Tool & Machine Co. v. Walter Kidde & Co., Inc.*, 409 F.Supp. 511, 513 (E.D.Pa.1976), *rev'd on other grounds,* 555 F.2d 342 (3d Cir.), *cert. denied*, 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 128 (1977); *Tabb v. United States*, 267 F.Supp. 187, 189 (M.D. Ga.1965), is the determinative yardstick in respect of the players' and NBA's burdens, with, of course, the ultimate burden of persuasion remaining on the players throughout to prove that the award should be set aside.

In this case, while the players have met their burden of proof and have established a prima facie violation of the Agreement, the NBA has failed to meet its burden of rebuttal. The sole articulated rationale for the Commissioner's award is to give Seattle fair value for Webster's loss. Since the award overcompensates Seattle to a significant degree and no rational case for the excess has been shown, the players have met their ultimate burden of persuasion.

NBA contends correctly that the court should not substitute its judgment for that of the Commissioner. Yet in providing for supervision and enforcement of the Agreement, the parties' clear intention was to afford in the Special Master and court review disinterested authority to determine, insofar as the issues here are concerned, whether the Commissioner's award complied with or violated the purpose of compensation as stated in the Agreement. Exercise of that responsibility in no way impinges upon the Commissioner's power to determine what form of compensation is appropriate in a given case.

The Special Master incorrectly held that he was not "endowed with plenary power of review of the Commissioner's compensation decisions" (Report of Special Master, p. 48). That, however, is precisely the power he is required to exercise in determining whether paragraph 2C(1) has been violated. The ruling of the Special Master denying the players' petition is reversed, and the Commissioner's award is set aside as a penalty in violation of the Agreement.

IT IS SO ORDERED.

---

4. This provides another reason for disallowing a NBA member club to challenge the Commissioner's award in a proceeding before the Special Master, since allowing such participation tends to obscure the fact that the Special Master's real function is not to review the Commissioner's determination as an arbitrator but to determine whether the latter's holding constitutes a breach of the contract made by NBA with the players.