In re RECORD CLUB OF AMERICA, INC., Debtor.

CAPITOL RECORDS, INC., Appellant,

v.

RECORD CLUB OF AMERICA, INC., Appellee.

Civ. A. No. 82–0990.

United States District Court, M.D. Pennsylvania.

March 29, 1983.

* The parties should contact the court concerning a timetable for the briefing of the merits of Coors' appeal.

**414**

Nancy G. Grossman, New York City, for Record Club of America.

Bernard A. Ryan, Jr., Neal D. Colton, Richard L. Berkman, E. David Chanin, Dechert, Price & Rhoads, Philadelphia, Pa., for Capitol Records.

## MEMORANDUM

RAMBO, District Judge.

The appellant, Capitol Records, Inc., and the appellee, Record Club of America, Inc. [hereinafter RCOA] entered into a non-exclusive licensing agreement on November 14, 1972. The agreement was terminated either on or about December 23, 1974 when RCOA filed for reorganization under Chapter XI of the Bankruptcy Act of 1898,[1] or on or about December 26, 1974 when Capitol notified RCOA of its unwillingness to continue.

Capitol has filed a claim against RCOA for money due it under the agreement. The Bankruptcy Referee allowed the claim of Capitol in the amount of $180,123.42. *In re Record Club of America, Inc.*, BK 74–553 (Bkry.M.D.Pa. May 25, 1982). Capitol has appealed the bankruptcy referee's order. The allegation is that $625,000.00 of "a non-returnable" advance which RCOA was to pay to Capitol under the agreement and which was not allowed by the referee, should have been allowed.

The bankruptcy referee made six (6) findings of fact which are as follows: ·

1. On November 14, 1972, RCOA and Capitol entered into a licensing agreement in settlement of anti-trust litigation RCOA had brought against Capitol.

2. Under the agreement RCOA obtained a non-exclusive right, for a minimum of five years (and, at RCOA's option, for ten years), to manufacture recordings from copies of record masters owned by Capitol.

3. The contract obligations pertinent to this proceeding are set forth in section 9 of the agreement:

9. COMPANY[1] hereby agrees to pay CAPITOL the following sums:

a. as a non-returnable advance for the first 5 years of the term: $1,250,000 payable

(1) $375,000 on signing this Agreement;

and

(2) the balance in 14 installments of $625,000 each on the first days of January, April, July and October of 1974, 1975, and 1976 and January and April of 1977.

9(b) Last paragraph:

The sums paid shall be non-returnable advances only against the total fees payable to CAPITOL under Paragraph 6.a. above. The sums payable in the 1st five year period (60 months from January 1, 1973) are advances only against total fees payable under Paragraph 6.a. for RECORDS sold or distributed.

4. The agreement provided for its termination in the event that RCOA went into bankruptcy.

5. On December 23, 1974, RCOA filed a petition for an arrangement under Chapter XI of the Bankruptcy Act. Three days later Capitol terminated the agreement.

6. Section 21 of the agreement provides the following as to termination:

The termination of this agreement shall cause all of COMPANY'S rights and obligation to cease except ... (ii) obligation for non-returnable advances after a termination pursuant to Para-

---

1. Paragraph 17a(2) of the licensing agreement.

graphs 17 a. or 17 b. above, or Section 22 below (which obligation shall limited to the remaining balance of the aggregate advance for which COMPANY is obligated for the particular period in which the termination occurs). . . .

[1] Refers to RCOA

*Id.* at 1–2.

This court after a review of the record on appeal has determined that these findings of fact are correct.

The bankruptcy referee in the decision appealed from has decided only one issue. He decided what amount of Capitol's claim No. 96 would be allowed.

The bankruptcy referee has *not* decided:

1. Whether Capitol's claim No. 96 was properly filed;

2. Whether the contract is void or voidable;

3. Whether the terms of the contract were violated by either party; and

4. Whether there are defenses to payment under the contract.

*See* Verbatim report of hearing held on December 18, 1980 before Judge Thomas Wood pp. 35–36 (hearing on various defenses and counter-claims of RCOA was deferred). This court therefore has before it *only* the question of the amount of Capitol's claim No. 96 that should be allowed.[2]

The dispute between the parties relates to the referee's legal determination that the term "particular period" used in paragraph 21 of the agreement refers to an "installment period." *Id.* at 3. The referee apparently used the terms "installment period" to refer to the three month time span between the dates on which the installment payments of the non-returnable advance were to be made. *See* Licensing Agreement ¶ 9.a.2. Thus the termination of the agreement prior to January 1, 1975 resulted in RCOA not being obligated to make the ten (10) installments due in January 1975 and every three months thereafter for the re-

mainder of the first five years of the agreement. These ten (10) installments total $625,000.00 which is the amount in controversy.

Neither the terms "particular period" or "installment period" are specifically defined in the agreement. Paragraph 21 uses "particular period" in the following context:

21. The termination of this Agreement shall cause all of COMPANY'S rights, interests and obligations to cease except (i) obligations theretofore accrued, (ii) obligations for non-returnable advances after a termination pursuant to Paragraphs 17.a. or 17.b. above, or Section 22. below (which obligation shall be limited to the remaining balance of the aggregate advance for which COMPANY is obligated for the *particular period* in which the termination occurs), (iii) obligations relating to liquidation provisions of Paragraph 21.b. below and (iv) as otherwise provided elsewhere in this Agreement and shall relieve CAPITOL from performing its obligations under this Agreement except as otherwise provided. Licensing Agreement ¶ 21 (emphasis added).

The time frame encompassed by the phrase "particular period" as used in paragraph 21 is not clear from the immediate context. Since the meaning of "particular period" is unclear from the immediate context, it is necessary to look at the entire agreement to determine if the meaning can be clarified.[3]

The basic objective in interpreting a contract is to determine the intentions of the parties from the language used. *In re Robertson Class Plaintiffs,* 479 F.Supp. 657, 668 (S.D.N.Y.1979) aff'd in part, rev'd in part, 625 F.2d 407 (2d Cir.1980).

Paragraph 9 of the agreement can provide some assistance in how the term "period" was understood by the parties. The concluding section of paragraph 9 says:

The sums paid shall be non-returnable advances only against the total fees pay-

---

**2.** The parties resolved Points II and III of the Capitol claim by a stipulation filed on March 10, 1983.

**3.** Parol evidence on the interpretation of the contract has been determined not to be admissible. *In re Record Club of America, Inc.,* 17 B.R. 756 (Bkrtcy.M.D.Pa.1982).

able to CAPITOL under Paragraph 6.a. above. The sums payable in the *1st five year period* (60 months from January 1, 1973) are advances only against total fees payable under Paragraph 6.a. for REC-ORDS sold or distributed in that *1st five year period* and similarly the sums payable in the *second five year period* (60 months from January 1, 1978) are advances only against total fees payable under Paragraph 6.a. for RECORDS sold or distributed in the second five year period. When the total amounts paid during the *first five year period* exceed $1,250,000 no further non-returnable advances are payable hereunder. When the total amounts paid during the *second period* exceed the applicable advance for the *second period* no further non-returnable advances are payable hereunder. Licensing Agreement ¶ 9 (emphasis added).

The above paragraph uses the term "period" six (6) times. Each use relates to either the initial five years of the agreement or to the second five years. Paragraph 9 divides the agreement into two five year "periods." The above paragraph relates the five year periods to the non-returnable advances.

The term "period" is used in a number of other paragraphs in the agreement. These other uses are for the most part specifically modified by a numerical indication of the months included in the period. Licensing Agreement ¶¶ 10(a), 22(a)–(b), 27(c), 28. Two specialized periods are established. Paragraph 8.a.(3) defines an "accounting period" of eighteen (18) months. Paragraph 21.b. defines a "liquidation period" of six (6) months after termination. The accounting period is related specifically to paragraph 8 and does not appear anywhere else in the agreement. It does not appear to be what the parties meant by "particular period."

The phrase "liquidation period" allows RCOA to dispose of unsold stock within six (6) months of termination. While this phrase occurs in the same paragraph of the agreement as the phrase "particular peri-

od," they do not appear to be equivalent. If the parties had intended "particular period" to mean "liquidation period," then they certainly could have used the latter term. If "liquidation period" is read in place of "particular period," then paragraph 21(ii) would read in part: "(which obligation shall be limited to the remaining balance of the aggregate advance for which COMPANY [RCOA] is obligated for the [liquidation] period in which the termination occurs)...." Logically the termination cannot occur during the liquidation period.

Paragraph 9 is also divided into parts a and b. Part a states the obligation of RCOA to pay a non-returnable advance for the first five years of the term.[4] Part b states RCOA's obligation to pay a non-returnable advance for *each year* of the last five years of the term. The non-returnable advance for the first five year period is treated as a whole, while the non-returnable advance for the second period is treated as yearly obligations. Such a distinction tends to support an understanding of the advance in the first period as a whole which is broken into parts for payment purposes only. The advance for the second period appears to be five separate yearly advances.

The termination provisions of the contract are also helpful in understanding what was intended by the parties. Paragraph 16 says:

16. Notwithstanding any other termination provisions expressly set forth herein, COMPANY may give notice to CAPITOL to terminate this Agreement after the expiration of the *first five year period* provided such notice is given in writing at least 18 months prior to the expiration of the first five year period and in such event COMPANY shall have no liability for the non-returnable advances under Paragraph 9.b. above. Licensing Agreement ¶ 16 (emphasis added).

Under the conditions for termination as set forth in paragraph 16 the non-returnable advances due for the second five year period were forgiven. The paragraph specifi-

---

**4.** The term of the agreement is defined in paragraph 2 of the agreement. The term is "a period of one hundred twenty consecutive months commencing on January 1, 1973."

cally and directly extinguished RCOA's liability for the advances as required by paragraph 9.b., i.e. those for the second five year period only.

Paragraph 17.b. also helps to clarify the relationship between termination and the non-returnable advances. Paragraph 17.b. says:

> b. If controlling interest in COMPANY is acquired by, or COMPANY is merged into or consolidated with any other person, firm or corporation, or if COMPANY voluntarily assigns or transfers all or substantially all of its assets to any other person, firm or corporation, other than to a corporation at least 90% of the stock of which is owned by the transferor, CAPITOL shall have the right at its election to terminate this Agreement by giving COMPANY 60 days written notice of such termination, except that CAPITOL will not unreasonably exercise its election to so terminate. However, *if such election to terminate is so made by CAPITOL, COMPANY shall thereafter be relieved of its obligation to make further payments on account of the non-returnable advances provided in Section 9. above.* COMPANY agrees to notify CAPITOL in writing forthwith upon the happening of any of the events set forth in this Paragraph 17.b. giving complete details of same and for a period of 30 days after its receipt CAPITOL shall have the election to give COMPANY any of the termination notices referred to in this Paragraph 17.b. Licensing Agreement ¶ 17(b) (emphasis added).

Under the specific type of termination which results from RCOA merging or consolidating with another entity, the agreement specifically relieves RCOA from paying the non-returnable advances.

If the agreement is terminated by the occurrence of one of the events specified in paragraph 24.a.(1) and Capitol elects to terminate under paragraph 24.a.(2)(b), then only certain portions of the non-returnable advance are due. If Friedman disposes of stock in RCOA to the extent that he no longer owns 51% of the stock, then the non-returnable advance is prorated. Licensing Agreement ¶ 26.b. Both paragraphs 24 and 26 provide specifically for a reduction or proration of the non-returnable advance upon termination.

When the focus returns to paragraph 17.a., it can be seen that bankruptcy by RCOA terminates the agreement. The termination causes "all of COMPANY's rights, interests and obligations under this Agreement to cease and shall relieve CAPITOL from any and all obligation to continue to perform its undertakings under this Agreement, *except* as otherwise expressly provided herein:...." Licensing Agreement ¶ 17.a. (emphasis added). Paragraph 17.a. continues but does not provide specifically for RCOA's continuing obligation to pay the non-returnable advance.

After reviewing these provisions of the contract, the meaning of section 21 can be determined. Paragraph 21 deals with RCOA's obligations if termination occurs pursuant to paragraph 17.a. Paragraph 17.a. calls for termination upon RCOA's filing for bankruptcy.

If termination occurs under paragraph 17.a. which makes no specific provision for the relief of RCOA from the non-returnable advances, then paragraph 21 must be the controlling provision. If the obligation of RCOA to pay the non-returnable advance is to continue after termination, then there must be an express provision in the agreement continuing it. *See supra* at 12.a.

Paragraph 21 says: "COMPANY's rights, interests and obligations ... cease except ... (ii) obligations for non-returnable advances after a termination pursuant to [Paragraph] 17.a. ... (which obligation shall be limited to the remaining balance of the aggregate advance for which COMPANY is obligated for the particular period in which the termination occurs) ...." Licensing Agreement ¶ 21.

The above discussion shows that the contract uses the term "period" to refer to the two five year periods into which the term is divided. There is no reason to believe that the parties intended "period" in this context to refer to some other time frame.

The legal conclusion is that the agreement has been terminated under paragraph 17.a. All RCOA's obligations are terminated unless expressly excepted in paragraph 21. One of the obligations expressly excepted is payment of the non-returnable advance "for the particular period." The contract uses the word "period" to refer to the two five year portions of the contract's term. Since the termination has occurred within the first five year period the non-returnable advance for that period is still owed by RCOA. Capitol's claim will be allowed in the amount of $805,123.42. The $805,123.42 is made up of the following amounts: $180,373.42 stipulated by the parties as due and owing, *see* Brief of Appellee, Exhibit A, plus $625,000.00 due and owing as the remainder of the non-returnable advance.

The case will be remanded to the bankruptcy court for further proceedings not inconsistent with this decision.