In the Matter of **ROBERTSON CLASS PLAINTIFFS** and **National Basketball Players Association, Petitioners-Appellees,**

v.

**NATIONAL BASKETBALL ASSOCIATION, Lawrence O'Brien and Seattle Supersonics, Respondents-Appellants,**

**New York Knickerbockers, Intervenor-Cross-Appellant.**

**Nos. 519, 520, 594, Dockets 79–7668, 79–7689 and 79–7736.**

United States Court of Appeals, Second Circuit.

Argued Jan. 21, 1980.

Decided June 11, 1980.

Van Graafeiland, Circuit Judge, filed opinion concurring in part and dissenting in part.

David J. Stern, Gen. Counsel, N. B. A., New York City (George G. Gallantz, Jeffrey A. Mishkin, Proskauer, Rose, Goetz & Mendelsohn, and Russell T. Granik, Asst. Gen. Counsel, N. B. A., New York City, on brief), for respondents-appellants N. B. A.

James W. Quinn, New York City (Irwin H. Warren, Weil, Gotshal & Manges, New York City, on brief), for petitioners-appellees.

Louis Nizer, New York City (Paul Martinson, Sidney D. Bluming, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, on brief), for intervenor-appellee and cross-appellant New York Knickerbockers.

Before OAKES, VAN GRAAFEILAND and NEWMAN, Circuit Judges.

NEWMAN, Circuit Judge:

This appeal presents some novel questions concerning the relationship between private and judicial decision-making. The questions arise in the context of a dispute concerning the amount of compensation that a professional basketball team should pay to another team when signing a player who has completed his contract with that other team. Our primary problem is to determine the appropriate roles of the Commissioner of the National Basketball League ("NBA") and the District Court in adjudicating the amount of compensation. To understand why a federal court has any role in this matter requires some familiarity with the factual and procedural background of this litigation.

### Facts

In 1970, several NBA players ("the Robertson Class plaintiffs") brought a class action against the NBA and its member teams, alleging that various practices agreed to by the teams impaired the players' rights to earn a livelihood and violated the federal antitrust laws. In 1976 that suit was settled, and the settlement was judicially approved. *Robertson v. National Basketball Association*, 72 F.R.D. 64 (S.D.N.Y.1976) (Carter, J.), *aff'd*, 556 F.2d 682 (2d Cir. 1977). The settlement agreement, which was incorporated into the final consent judgment, provided in ¶8 that the District Court would retain jurisdiction over the defendants and the class members to enforce the terms of the settlement and the consent judgment. The settlement further provided that the District Court would appoint a Special Master "who shall have exclusive jurisdiction to enforce the terms" of the settlement. The Special Master is obliged to make findings of fact and recommendations for relief, and the District Court is required to accept the findings of fact unless clearly erroneous and to accept the recommendations for relief unless based on clearly erroneous findings of fact, incorrect application of law, or abuse of discretion.

One of the substantive terms of the settlement concerned what is known as the compensation rule. This rule, as it existed prior to the settlement, required a team ("the new team") that signs a player ("a veteran free agent") who has completed his contract with another team ("the old team") to pay the old team compensation for the loss of that player. Compensation was paid in the form of one or more players, one or more draft choices (the exclusive right to sign promising college players), cash, or some combination of the three. If the old and new teams could not agree on appropriate compensation, a binding decision was made by the NBA Commissioner. In their antitrust suit, the players had attacked the compensation rule, contending that it unlawfully interfered with their opportunity to negotiate contracts with new teams after completing their contracts with their old teams. The players were concerned that teams would be deterred from signing veteran free agents by the prospect of paying compensation to the old team, and there was particular concern that the Commissioner, at the behest of some of the team owners, was setting high compensation awards to increase the deterrent effect of the rule.

Section 2 of the settlement agreement included the following provisions to govern the compensation rule from 1977 to 1981:

### C. *Compensation Rule*

(1) Under the compensation rule currently applicable in the NBA when a Veteran Free Agent signs a Player Contract with an NBA team (hereinafter the "new team") other than the NBA team for which he had last previously played (hereinafter the "prior team"), if the new team and prior team are unable to agree upon the compensation to be paid to the prior team for the loss of such Veteran Free Agent, the Commissioner of the NBA, who has full, complete and final jurisdiction of any dispute involving the new team and the prior team, is authorized, but not required, to make an award of compensation to the prior team. The award by the Commissioner may take the form of assignment of Player Contract(s) and/or draft choice(s) and/or cash. Although the decision of whether to award compensation and, if so, what form of compensation is fair and equitable, lies in the sole discretion of the Commissioner, the purpose of the compensation rule described above is not to serve as a penalty, but is to ensure that a team which loses such a player is, to the nearest extent possible, made whole for the loss of such player.

(2) The current compensation rule described in paragraph C(1) above will remain in effect until the end of the 1980–1981 NBA playing season and there shall be no other compensation obligation, rule, practice, policy, regulation or agreement created or applied in the NBA during that period. During that period a Veteran Free Agent may negotiate and sign a Player Contract with any NBA team and any NBA team may negotiate and sign a Player Contract with any Veteran Free Agent without any penalty or restriction subject only to the compensation rule described in paragraph C(1) above. No compensation obligation, rule, practice, policy, regulation or agreement shall apply to any Veteran Free Agent who seeks to negotiate or sign a player contract with or play with any team in any professional basketball league other than the NBA.

After 1981, the compensation rule is abolished. From 1981 to 1987 the settlement agreement grants a right of first refusal to a team losing a veteran free agent to another team. The old team can continue the player under contract if it can match the offer of the new team. After 1987, there are no restrictions on the signing of veteran free agents.

This case concerns the application of these procedural and substantive provisions of the settlement agreement to the 1978 signing of Marvin Webster by the New York Knickerbockers. Webster completed his contract obligations with the Seattle Supersonics and became a veteran free agent at the close of the 1977–78 basketball season. When Seattle and New York were unable to agree upon compensation, the NBA Commissioner, Lawrence O'Brien, adjudicated the dispute. The Commissioner awarded Seattle a compensation package consisting of the contract for a New York player, Lonnie Shelton, New York's right to make a first-round selection in the 1979 college draft, and $450,000.

The Robertson Class plaintiffs and the National Basketball Players Association ("NBPA" or "players"), which was authorized by the settlement agreement to seek enforcement of its terms, filed with the Special Master, Telford Taylor, Esq., a petition to have the compensation award set aside as a penalty within the meaning of ¶ 2(C)(1) of the agreement. Named as respondents were the NBA, the Commissioner, and the Seattle team. The NBPA, which had not appeared before the Commissioner, presented evidence challenging the size of the award and contended, among other things, that it was unduly high compared to compensation awards the Commissioner had made in prior cases. The Seattle team appeared before the Master to support the award, and the New York team appeared in opposition to it.

After holding five days of hearings, the Special Master issued a carefully prepared 53-page report. He concluded that the Webster award was "excessive." He also

concluded that an award could not be set aside as a penalty unless "either (a) there is substantial evidence that the Commissioner *intended* to make the team losing the player more than whole, or (b) the award is shown to be so clearly excessive that it must either be attributed to such intent or regarded as a gross error of judgment." Applying this standard, the Master denied the petition to set aside the award. He found no evidence of intent to make the Supersonics more than whole, apart from the size of the award itself, which apparently was not deemed a sufficient basis from which to infer an improper intent. With respect to the size of the award itself, the Master stated:

> Webster's exceptional attributes as a center, and the salary he was offered by both of the contending teams, are strong evidence in support of a large award. The circumstances which qualify those indicia of value, and which, in my opinion, support a conclusion that the award was excessive, are not beyond the reach of rational argument to the contrary.
>
> On this record, therefore, I cannot conscientiously rule that the award is so excessive as to be irrational or constitute an abuse of discretion.

The Master also ruled on two procedural matters, both of which are in dispute on this appeal. First, he ruled that in all future proceedings to challenge compensation awards, the players could not present any evidence before the Master that they could have presented in proceedings before the Commissioner. Second, he ruled that both the team losing the veteran free agent and the team signing him were proper parties to participate in the proceedings before the Master.

Upon review of the Master's decision, sought by both the NBPA and the Knickerbockers, the United States District Court for the Southern District of New York (Robert L. Carter, Judge), reversed, granted the players' petition challenging the Webster award as a penalty, and ordered the award set aside. *In re Robertson Class Plaintiffs*, 479 F.Supp. 657 (S.D.N.Y.1979).

Judge Carter ruled that the settlement agreement conferred upon the Master plenary authority to determine whether a compensation award was more than an amount that would make the veteran free agent's old team whole, *i. e.*, more than the value of the player, and that since the Master had found the Webster award excessive, it should be set aside as a penalty proscribed by ¶ 2(C)(1). Judge Carter also overturned the Master's procedural rulings, concluding that the players were entitled to present evidence at a proceeding before the Master, even though they had not taken advantage of an opportunity to do so before the Commissioner, and that the team signing a veteran free agent could not appear at proceedings before the Master to challenge a compensation award. The NBA appeals from Judge Carter's ruling vacating the Webster award and permitting the players to present evidence in future proceedings before the Master; the intervening New York team cross-appeals from the ruling denying them standing before the Master.

### Discussion

Though this litigation started as an antitrust case, it is now essentially a contract dispute, requiring construction of the settlement agreement. See, *e. g.*, *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975). The differences between the contentions of the parties, and between the views expressed by the Special Master and the District Court, stem primarily from their differing perceptions of the essential structure for dispute resolution that was created by the agreement. The NBA and the Special Master read the agreement as maintaining the role of the Commissioner as a primary decision-maker, at least with respect to compensation awards, with the Court playing a secondary role of reviewing the Commissioner's decisions and correcting only those decisions that can be said to constitute an abuse of the Commissioner's discretion. On the other hand, the NBPA and the District Court read the agreement as vesting in the Court (with primary authority exercised by the Special Master)

virtually plenary authority to determine whether the substantive standards of the agreement have been observed. The first view emphasizes the Commissioner's role as an adjudicator between the disputing teams. The second view emphasizes the Commissioner's role as one of the disputants in the conflict between the interests of the teams and the interests of the players.

We think the agreement must be construed in light of the litigation it settled and that the District Court's basic view of the roles of the Commissioner and the Special Master is correct. Recognizing that the Commissioner is not a neutral decision-maker *vis-a-vis* the players and that the Commissioner and the NBA have agreed to submit the enforcement of the terms of the agreement to the District Court leads to resolution of the three disputes raised on this appeal.

### 1. The Compensation Award

The agreement contemplates that when two teams cannot agree on compensation for signing a veteran free agent, the Commissioner will select an amount that makes the free agent's old team "whole." The agreement also specifies that the purpose of the compensation rule is not to serve as a penalty to the free agent's new team. The Commissioner has "discretion" to set the amount of the award, yet he is not to impose a "penalty." These terms tend to create an internal conflict within the agreement. If the amount of compensation were left entirely in the Commissioner's discretion, he could defeat the purpose of the agreement by selecting an amount that would make the old team more than whole, and in some circumstances would be a penalty. On the other hand, if a penalty were any amount that would make the old team more than whole, then the District Court, acting through the Special Master, could set aside all awards thought to exceed the value of the free agent and thereby leave the Commissioner with virtually no discretion at all. This internal conflict between the terms of the agreement requires, if at all possible, a resolution that carries out the

basic purposes of the parties in making the agreement. Manifestly among those purposes, as appears from the face of the agreement, are the interim continuation of the basic structure of the compensation system and the prohibition against a use of that system to deter the signing of veteran free agents by imposing penalties on the teams that sign them.

■ In our view, the purposes of the agreement can be carried out by construing its terms more rigorously than did the Special Master but less rigorously than did the District Judge. We fully agree with Judge Carter that the Special Master erred in according the Commissioner a discretion reviewable only by the same "abuse of discretion" standard that an appellate court applies to discretionary rulings of a trial court. As Judge Carter pointed out, the Commissioner is not a neutral magistrate in his relationship to the players. 479 F.Supp. at 669–70. That does not mean that the players can challenge in court every decision the Commissioner makes. However, once the agreement settled the players' antitrust claim by giving them enforceable rights, including the right to make sure that a free agent's signing is not deterred by the imposition of a penalty upon the signing team, the players acquired the right to challenge compensation awards on the ground that they are penalties.

■ At the same time, we believe the nature of the court challenge contemplated by the settlement agreement must respect the agreement's purpose of continuing the basic structure of the compensation procedure. That means according the Commissioner some latitude to determine an appropriate amount of compensation, yet permitting a successful court challenge to his determinations when they exceed the fair value of the player by an increment sufficient to result in an award deserving of the label "penalty." We therefore do not agree with Judge Carter that the players establish their case by proof that "the relative worth of the compensation exceeds the value of the lost player," unless the excess is "insignificant." *Id.* at 670. That approach per-

mits the Special Master to set aside virtually any award that is more than the amount the Master finds the player is worth, without regard to the extent of the increment. That would leave the Commissioner with almost no discretion.

Obviously our effort to construe the agreement so as to carry out its purposes leaves some ambiguity as to how much of an increment over fair value can be tolerated before an award can be condemned as a penalty. We do not think the increment must be so large as to indicate either an intention on the part of the Commissioner to make the team losing the player more than whole or a gross error of judgment by the Commissioner. While evidence of intent to exact a penalty would be relevant, the agreement assured the players that the amount awarded will not be a penalty, regardless of whether such a thought entered the Commissioner's mind. Moreover, examining whether the size of the increment over fair value indicates that a gross error of judgment has occurred risks converting court challenge to the award into the kind of review proceeding appropriate only when the decisions of neutral decision-makers are tested. On the other hand, we do not expect the Special Master to find that a penalty has been imposed simply because he finds the award just slightly in excess of what he believes to be fair value. The increment must be significant. While we do not wish to inject mathematical certainty into an area that requires some flexibility, we would not think the Special Master would be unwarranted in concluding that an award becomes a penalty when it exceeds the fair value of the player by approximately 20% to 25%.

In his opinion upholding the Master's finding that the compensation award was "excessive," Judge Carter concluded that the compensation award exceeded Webster's value by a "significant" amount. 479 F.Supp. 670. We do not question Judge Carter's conclusion that the evidence before

the Special Master was sufficient to support a finding that the award exceeds the player's value by a "significant" amount, significant enough to be, in Judge Carter's view, a penalty. But under the agreement, the requisite finding is to be made by the Master, with the District Court determining only whether the Master's finding is clearly erroneous.

In this case, we cannot be certain whether the Special Master has found the award to be a penalty and thus properly to be set aside under our interpretation of the agreement. No doubt he found the award to be "excessive," but we are left uncertain what he meant by that adjective. If he meant only that the award is more than the worth of the player, the award should stand. But if he meant, as appears likely, that the award exceeds the worth of the player by an increment sufficient to make the award a penalty, then under the agreement he is obliged to set the award aside.[1] The matter should be remanded to the Master so that he can apply the agreement, as we have construed it, to the facts as he finds them to be.

The NBA vigorously challenges a construction of the agreement that accords the Special Master any authority over compensation awards beyond determining whether an award constitutes an abuse of the Commissioner's discretion. Two concerns are especially pressed. First, the NBA contends that part of the bargain resulting in the overall settlement of the antitrust suit was a continuation, for the period from 1977–1981, of the compensation rule, as it existed prior to the settlement. As the agreement states in ¶ 2(C)(2), during that period the "current" compensation rule will remain in effect. Yet even the position of the NBA acknowledges that the pre-1977 rule is not being continued unchanged; according the Special Master even the power to set aside awards that constitute an abuse of the Commissioner's discretion would itself be a significant departure from prior

---

1. We need not determine whether, in the event the Special Master concludes that the award is a penalty, his authority to recommend relief, Agreement, ¶ 8(c)(i), includes the authority to make a new award.

practice, under which the Commissioner's determination was unreviewable.

The agreement undoubtedly continued the substance of the prior compensation rule, and that rule, as described in the agreement, prohibits awards so high as to serve as penalties. What the agreement altered is the procedure for preventing such penalties. Under the agreement the authority to enforce its terms, including its prohibition against penalties, is vested in the District Court, acting through the Special Master. This procedural change was emphasized by the parties when, on the prior appeal, they successfully urged this Court to affirm the District Court's approval of the settlement agreement. The NBPA noted in its brief on that appeal that the agreement changed the compensation rule to provide for "procedural safeguards," to preclude "penal compensation in any case," and to permit "an expedited hearing to review any alleged improper application of the rule." Brief for Appellee NBPA at 46, *Robertson v. National Basketball Association*, 556 F.2d 682 (2d Cir. 1977). The NBA's brief specifically referred this Court to the players' characterization of the changes brought about by the agreement. Brief for Appellee NBA at 5, *ibid.*

Second, the NBA contends that the courts, unfamiliar with the nuances of basketball skills, are ill equipped to make judgments concerning the value of a professional basketball player. Again, the force of this argument is somewhat blunted by the concession that the court should review decisions of the Commissioner at least to determine whether his awards constitute an abuse of discretion. It is not readily apparent why a court can be relied upon to determine when a basketball player has been overvalued to such an extent that discretion has been abused, but cannot determine when the overvaluation is high enough to constitute a penalty.

We would not have been in the least displeased if the parties to the antitrust suit had settled their differences on a basis that kept the amount of compensation awards completely immune from judicial scrutiny.

But they did not. Instead, the NBA, which now so earnestly urges the court to stay out of the matter, decided to avoid the risk of an antitrust liability adjudication by giving the court explicit authority to enforce an agreement that contains a significant substantive limit on compensation awards. It was open to the NBA to bargain for an interim compensation rule whereby the award of the Commissioner was final not only between the teams, as the agreement now states, but also between the NBA and the players. Having imposed upon the courts the obligation to enforce the terms of the agreement, including its prohibition against penalties for the signing of veteran free agents, the NBA is in no position to complain when the court decides the matter that was entrusted to it. Moreover, while valuation of basketball players is hardly a traditional judicial task, adjudicating disputes concerning valuation, whether of property or personal services, is what courts do all the time. And they do so precisely as the Special Master did in this case—by considering expert views presented by both sides and comparing the values urged in the pending dispute with the values determined in previous disputes.

2. The Players' Rights at Proceedings Before the Special Master

■ Our review of the basic structure contemplated by the agreement resolves the dispute as to whether the players are entitled to present evidence before the Special Master when they passed up the opportunity to do so at the proceedings before the Commissioner. We agree with the District Court that they are.

If the Commissioner were a neutral decision-maker, whose decisions were subject to limited judicial review only for abuse of discretion, it would make sense to oblige the players to present all their evidence to the Commissioner and limit their court review to a claim that the Commissioner abused his discretion in the decision he made on the basis of the evidence he heard. But, as we have discussed, that is not the procedural arrangement contemplated by the agree-

ment. The issue is not whether the Commissioner has abused his discretion, but whether his award is a penalty. While the players have been invited to appear before the Commissioner[2] they are not obliged to do so, and apparently prefer not to devote their resources to every compensation dispute between NBA teams.

Under the agreement, the players are entitled to wait and see whether or not the Commissioner makes an award that, in their judgment, merits court challenge as a penalty. We are advised that "dozens" of compensation awards have been made without court challenge. As far as the players are concerned, if the Commissioner imposes an award so high as to be a penalty, it makes no difference whether he does so after a full hearing between the disputing teams or simply announces an award without any hearing at all. The agreement accords them the right to have the court set aside any award that is a penalty, and they are entitled to present their evidence to the Special Master to show that the agreement has been violated. As Judge Carter pointed out, the proceeding before the Special Master is not a *de novo* review proceeding; it is a first-time test of the validity of the award according to the standards of the agreement. 479 F.Supp. at 665.

3. The Knickerbockers' Standing at Proceedings Before the Special Master

The District Court ruled that the New York Knickerbockers lack standing to appear before the Special Master to contest the lawfulness of the compensation award. Apparently no similar ruling was made to deny the Seattle Supersonics the right to appear in support of the award. On the cross-appeal by the Knicks, the NBA urges that 'the Knicks be denied standing.

■ Neither the Knicks nor the NBA have been able to refer us to much in the way of useful precedent or analogy. The

procedural rights of the various participants in the compensation controversy, including the teams, must be determined by the nature of the settlement agreement itself. We agree with Judge Carter that the settlement was not intended to alter the final and unreviewable authority of the Commissioner to resolve compensation disputes as between member teams of the NBA. Though the teams are parties to the agreement, it accords them no enforceable right to challenge a compensation award as either too high or too low. The enforceable prohibition against an award so high as to be a penalty is for the benefit of the players. We therefore agree with the District Court that the Knicks have no standing to initiate a proceeding before the Master to challenge a compensation award.

■ However, once a challenge has been brought by the players, we think a reasonable construction of the agreement permits participation by both the team awarded the challenged compensation and the team obliged to pay it. Though the teams have bound themselves, by agreeing to the NBA Constitution, to accept the rulings of the Commissioner on disputes such as compensation, they have not given up the right to appear in court when a dispute that will determine how much one team should pay another has been properly initiated by the players. Allowing a party that cannot initiate a lawsuit to intervene in one properly brought by others is unusual but not unprecedented. See *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 536–37, 92 S.Ct. 630, 635, 30 L.Ed.2d 686 (1972).

Conclusion

We conclude (1) that the players may participate and present evidence before the Special Master whether or not they have appeared before the Commissioner, (2) that teams in a compensation dispute may not

2. Nothing in the agreement entitles the players to participate in a proceeding before the Commissioner involving the two teams in dispute. In a contested matter before the Special Master prior to this one, the Master suggested that their participation ought to be allowed, and the

Commissioner thereafter invited them to do so. That invitation may save some time in those instances when it is accepted, but it cannot serve to preclude the players from presenting evidence to the Special Master when it is declined.

**416**

initiate court challenges to compensation awards, but may intervene in court proceedings initiated by the players, and (3) that the Special Master must set aside any compensation award determined to be so significantly above the value of the newly signed veteran free agent as to constitute a penalty. The judgment of the District Court is affirmed in part and reversed in part, and the case is remanded for further proceedings before the Special Master in accordance with this opinion.

VAN GRAAFEILAND, Circuit Judge, (concurring in part and dissenting in part):

I agree that that portion of the district court's judgment setting aside the award of the Commissioner must be reversed but would reinstate the award as approved by the Special Master.

The pertinent provisions of the settlement agreement were as follows:

1. The NBA Commissioner has full, complete, and final jurisdiction of any dispute between teams including the awarding of compensation.

2. The decision as to what form of compensation is fair and equitable lies in the sole discretion of the Commissioner.

3. The purpose of the compensation rule is not to serve as a penalty but to insure that the team losing a player is made whole to the nearest extent possible.

The majority put abuse of discretion and the making of a penalty award into two separate categories. As Judge Newman puts it, "The issue is not whether the Commissioner has abused his discretion, but whether his award is a penalty." I believe that the two issues are inseparable. If the award constitutes a penalty, there has been an abuse of discretion; if it is so unfair and inequitable as to represent an abuse of discretion, it is a penalty. The Special Master having found that the award was not so excessive as to be irrational or constitute an abuse of discretion, I would permit it to stand.

In all other respects I concur with the majority.