905 F.2d 610
 134 L.R.R.M. (BNA) 3161, 117 Lab.Cas. P 10,463
 UNITED STATES of America, Plaintiff-Appellee,
v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF AMERICA, AFL-CIO, et
al., Defendants.
Appeal of Harold FRIEDMAN, Eleventh Vice President, Defendant.
Appeal of Anthony HUGHES, Respondent-Movant.
 Nos. 896, 897, 1439, 1440, 1505, Dockets 89-6248, 89-6250,
90-6136, 90-6138, 90-6142.
 United States Court of Appeals,
Second Circuit.
 Argued April 30, 1990.
Decided June 1, 1990.
 
 Walter P. Loughlin, New York City (Mudge Rose Guthrie Alexander & Ferdon, James T. Grady, Washington, D.C., Gen. Counsel, IBT, Jed S. Rakoff, Robert P. Knapp III, Ralph P. DeSanto, Vincent P. Esposito, Jr., of counsel), for defendants Intern. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO.
 Paul J. Cambria, Jr., Buffalo, N.Y. (Lipsitz, Green, Fahringer, Roll, Schuller & James, William M. Feigenbaum, Richard P. Weisbeck, Jr., of counsel), for defendant Harold Friedman.
 Moses Krislov, Cleveland, Ohio (Daniel Markewich, New York City, of counsel), for respondent-movant Anthony Hughes.
 Randy M. Mastro, New York City, Asst. U.S. Atty. for the S.D. of N.Y. (Otto G. Obermaier, U.S. Atty. for the S.D. of N.Y., Edward T. Ferguson, III, Richard W. Mark, Asst. U.S. Attys., of counsel), for plaintiff-appellee.
 Charles M. Carberry, Investigations Officer, New York City (Robert W. Gaffey, New York City, of counsel), for plaintiff-appellee.
 Before FEINBERG, MESKILL and WINTER, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 These appeals challenge the implementation in particular respects of a voluntary settlement effected in March 14, 1989 (the Consent Decree) in an action brought by plaintiff-appellee United States of America (the government) in the United States District Court for the Southern District of New York against defendants-appellants International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO (the IBT), the IBT's General Executive Board (the GEB), individual members of the GEB, including Harold Friedman, and various reputed members and associates of La Cosa Nostra, an alleged criminal organization.
 
 
 2
 Harold Friedman and Anthony Hughes appeal from a March 13, 1990 opinion and order of Judge David N. Edelstein, upholding the decision of an Independent Administrator (the Administrator), appointed pursuant to the Consent Decree, that imposed a one-year suspension from union office upon Friedman and Hughes. The basis of the suspension was their 1989 criminal convictions in a federal district court in Ohio. These two appeals have been consolidated with prior appeals by Friedman and Hughes from a November 2, 1989 memorandum and order of the district court, reported at 725 F.Supp. 162, which upheld the authority of the Administrator, pursuant to the Consent Decree, to hear charges against them. Defendant-appellant IBT appeals from that part of the March 13, 1990 order that upheld the power of the Administrator to invalidate a Resolution passed by the GEB.
 
 
 3
 For reasons given below, we affirm the orders of the district court.
 
 Background
 
 4
 These appeals have a complex procedural history. In June 1988, the government brought this suit under the civil remedies provision of the Racketeer Influenced and Corrupt Organizations Act (RICO). See 18 U.S.C. Sec. 1964. The complaint alleged that the IBT was controlled by La Cosa Nostra and sought sweeping reforms of the IBT, including the appointment of trustees to conduct the affairs of the IBT, wide-ranging electoral reforms and permanent injunctions against the commission of racketeering within the union.
 
 
 5
 In March 1989, on the eve of trial, the government, the IBT and most of the members of the GEB including appellant Friedman entered into the Consent Decree, which is a comprehensive document covering 31 double-spaced typewritten pages. In the preface to the Consent Decree, the union defendants, including Friedman, acknowledged that "there have been allegations, sworn testimony and judicial findings of past problems with La Cosa Nostra corruption of various elements of the IBT" and agreed that "there should be no criminal element or La Cosa Nostra corruption of any part of the IBT." The Consent Decree put the RICO claims in abeyance, replacing that litigation with a systematic mechanism to achieve reforms throughout the IBT over the next few years, including direct rank-and-file elections of the union leadership and enhanced procedures for investigation and discipline of corrupt union officials. The Consent Decree stated that the district court would retain jurisdiction "over this case" until "satisfactory completion and implementation of the terms and conditions" of the Consent Decree, which, with some exceptions, is apparently contemplated to occur in 1992.
 
 
 6
 The specific terms of the Consent Decree are as follows. Under the Consent Decree, three court officers are appointed to oversee certain aspects of the affairs of the IBT: an Election Officer, an Investigations Officer and an Administrator. The Election Officer is to supervise the 1991 election of IBT officers. The Investigations Officer is granted authority to investigate corruption and prosecute disciplinary charges against any officer, member or employee of the IBT or any of its affiliates. The Administrator oversees the implementation of the remedial provisions of the Consent Decree. For example, the Administrator sits as an impartial decisionmaker in disciplinary cases brought by the Investigations Officer, conducts the disciplinary hearings and decides them. The Administrator may also apply to the district court to facilitate implementation of the Consent Decree, and the other parties to the Decree may make such applications as well. Furthermore, the district court is vested with "exclusive jurisdiction" to decide any issues relating to the actions or authority of the Administrator. And the IBT Constitution is amended to incorporate and conform with all of the terms of the Consent Decree.
 
 
 7
 Friedman and Hughes are the first two IBT officials charged and tried under the remedial scheme created by the Consent Decree. Friedman was a named defendant in the underlying civil RICO lawsuit in the Southern District and a signatory to the Consent Decree. At that time, Friedman was a member of the GEB, being the Eleventh Vice-President of the IBT. In addition, he was President of Local 507 located in Cleveland, Ohio, and President of the Ohio Conference of Teamsters. Friedman subsequently resigned from the GEB, but remained as President of Local 507 and the Ohio Conference of Teamsters until the time of his suspension. Hughes was until the time of his suspension the Recording Secretary of Local 507 in Cleveland.
 
 
 8
 In 1986, Friedman, Hughes and the late Jackie Presser (former IBT General President) were named as co-defendants in a criminal indictment in the United States District Court for the Northern District of Ohio. United States v. Friedman et al., Cr. 86-114 (N.D.Ohio) (White, J.). The indictment charged, among other things, that the defendants had committed various RICO offenses and had embezzled from certain unions through a "ghost employee" scheme. After the indictment was filed, Friedman was re-elected as President of Teamster Local 507, and Hughes was re-elected as Recording Secretary of Teamster Local 507. Subsequently, in May 1989, Friedman and Hughes were convicted of various charges contained in the indictment, and each was sentenced to a four-year term of probation and separation from all IBT-related activity for concurrent four-year periods. Judge White stayed the sentences pending the outcome of appeals by Friedman and Hughes to the United States Court of Appeals for the Sixth Circuit. The appeals are scheduled to be heard on June 4, 1990.
 
 
 9
 In July 1989, the Investigations Officer filed separate union disciplinary charges before the Administrator, seeking to remove Friedman and Hughes from office (Charge I). Specifically, the Investigations Officer charged Friedman and Hughes with conducting themselves in a manner that brought reproach on the IBT, in violation of Article II, section 2(a), of the IBT Constitution. That section requires all IBT members to subscribe to an oath of loyalty; the oath obligates each member, among other things, "to conduct himself or herself at all times in such a manner as not to bring reproach upon the Union."[1] Article XIX, section 6(b)(2), of the IBT Constitution provides that violation of the oath of loyalty constitutes a specific basis for union disciplinary charges. The charges against Friedman and Hughes treated their criminal convictions as the underlying conduct that formed the basis of their violations of Article II, section 2(a). In September 1989, the Investigations Officer filed a second charge against Friedman alone, alleging that he had brought reproach upon the IBT by knowingly associating with members of La Cosa Nostra (Charge II).
 
 
 10
 In mid-August 1989, Friedman and Hughes challenged the Administrator's authority to hear the disciplinary charges against them. In September 1989, the Administrator rejected the challenges in a written opinion, and shortly thereafter applied to the district court for review of his decision. Friedman and Hughes in turn moved the district court for a preliminary injunction to prevent the charges from going forward.
 
 
 11
 On November 1, 1989, the GEB enacted a resolution (the Resolution) interpreting the term "reproach upon the Union" of the IBT Constitution in a manner, explained more fully below, that would apparently preclude the disciplinary charges against Friedman and Hughes.
 
 
 12
 On November 2, 1989, the district court granted the Administrator's application and denied the motions of Friedman and Hughes, thus allowing the disciplinary hearings before the Administrator to proceed. Friedman and Hughes then appealed to this court and sought a stay of their disciplinary hearings. In December 1989, a panel of this court denied their motions for a stay and denied the motion of the government to dismiss the appeals for lack of jurisdiction.
 
 
 13
 In January 1990, the Administrator issued an opinion suspending Friedman and Hughes from all IBT posts for one year. In reaching that result, the Administrator considered the effect of the recent GEB Resolution on the pending charges, and concluded that he was not bound by it. The Administrator subsequently applied to the district court for review of the merits of his decision on the charges. Friedman and Hughes cross-applied for review and sought an order permanently enjoining the Administrator and the Investigations Officer from subjecting them to disciplinary proceedings.
 
 
 14
 After the Administrator's January 1990 opinion, the government moved in this court to dismiss the earlier appeals of Friedman and Hughes as moot. A panel of this court denied the motion, but deferred further consideration of the earlier appeals until any appeal from the ruling of the district court on the Administrator's application for a review of his decision on the merits.
 
 
 15
 On March 13, 1990, the district court issued an opinion and order affirming the one-year suspensions and denying appellants' motions for a permanent injunction. Appellants appealed from the district court's decision and moved this court to stay their removal from union office pending appeal. On March 27, 1990, a panel of this court denied the motions but expedited the appeals. Although not a party to this appeal, the Investigations Officer was granted permission to submit a brief and to share the government's time at oral argument.
 
 Discussion
 
 16
 At the outset we note that appellants Friedman, Hughes and the IBT raise a number of essentially similar claims. Accordingly, we first address the issues that permeate the appeals of all three appellants, identifying only where necessary for the sake of accuracy the arguments raised by individual parties. This first set of issues involves the Administrator's authority to override the Resolution that purported to interpret certain disciplinary provisions of the IBT Constitution as well as the reasonableness of the Resolution. Next, we turn to a consideration of the common issues raised by Friedman and Hughes, namely, whether certain provisions of the IBT Constitution or the doctrine of collateral estoppel bar Charge I. Finally, we turn to the individual issues raised by Friedman and Hughes, the most significant being whether Hughes as a nonparty is bound by the disciplinary provisions of the Consent Decree. In addressing the appeals of Friedman and Hughes, we do not find it necessary to distinguish between arguments raised in their initial appeals from those raised in their subsequent appeals, since the later briefs incorporate by reference all applicable arguments from the earlier appeals.
 
 I. Preliminary Issues
 A. Jurisdiction
 
 17
 As a threshold matter, we must consider whether we have jurisdiction to entertain these appeals. Paragraph 12(A) of the Consent Decree provides that the Administrator's decisions are "final and binding, subject to the [district] Court's review as provided herein," and paragraph 16 further provides that the district court "shall have exclusive jurisdiction to decide any and all issues relating to the Administrator's actions or authority" under the Consent Decree. The government, seconded by the Investigations Officer, argues that the language of the Consent Decree defines the rights of the parties, and that appeal to this court is not among them.
 
 
 18
 National labor policy does not favor waivers of statutory rights by unions, so that a union's intention to waive a statutorily protected right must be clear and unmistakable before a claim of waiver may succeed. See, e.g., Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 708 & n. 12, 103 S.Ct. 1467, 1477 & n. 12, 75 L.Ed.2d 387 (1983); Chesapeake & Potomac Tel. Co. v. NLRB, 687 F.2d 633, 636 (2d Cir.1982). Such a clear and unmistakable intent is not present here, since the phrase "exclusive jurisdiction," read in the context of the Consent Decree, does not unambiguously exclude appellate review. Appellants argue that paragraph 16 was merely intended as a provision on venue, such as the typical retention-of-jurisdiction provision commonly found in consent decrees. See, e.g., In re Robertson Class Plaintiffs v. National Basketball Ass'n, 625 F.2d 407, 409 (2d Cir.1980). Nothing in the Consent Decree indicates that the parties intended to waive their right to invoke the jurisdiction of this court. Moreover, the government conceded at oral argument that the availability of appellate review was never discussed in the course of negotiations. Finally, this court, in another appeal involving the same Consent Decree, did not question the existence of appellate jurisdiction in applying paragraph 16 as a venue requirement. See United States v. International Bhd. of Teamsters, 899 F.2d 143, 146 (2d Cir.1990).
 
 
 19
 The Investigations Officer also argues that we lack jurisdiction because the orders of the district court under attack are neither final under 28 U.S.C. Sec. 1291, nor appealable collateral orders. In support, he cites paragraph 2 of the Consent Decree, which provides that
 
 
 20
 Upon satisfactory completion and implementation of the terms and conditions of this order, this Court shall entertain a joint motion of the parties hereto for entry of judgment dismissing this action with prejudice....
 
 
 21
 Under this theory, appellate review would be unavailable during implementation of the Consent Decree because no final judgment in the lawsuit has yet been entered.
 
 
 22
 We are not persuaded that we lack jurisdiction over the appeals of Friedman and Hughes from the district court's denial of their requests for injunctive relief. Those rulings are appealable under 28 U.S.C. Sec. 1292(a)(1), since Friedman and Hughes will immediately suffer serious, perhaps irreparable, consequences and the orders may be effectually challenged only by immediate appeal. See Carson v. American Brands, Inc., 450 U.S. 79, 84, 101 S.Ct. 993, 996, 67 L.Ed.2d 59 (1981). This is so because the final judgment officially terminating the underlying RICO action in the Southern District will not be entered until the completion of the executory provisions of the Consent Decree, by which time Friedman and Hughes will have served their one-year suspensions.
 
 
 23
 The government argues that this court should not have to review all of the "hundreds of decisions" that will be litigated in the district court regarding implementation of the Consent Decree. Certainly, the policies behind the final judgment rule in the federal courts support that view, and we emphasize that we by no means suggest that all of the Administrator's decisions will be immediately appealable to this court after the district court has passed upon them. Indeed, the appeal of the IBT from that portion of the March 1990 order that determined the respective interpretive powers of the GEB and the Administrator is more problematic. Unlike appellants Friedman and Hughes, the IBT is not appealing from an order denying it injunctive relief to prevent serious consequences, which can be effectively challenged only by an immediate appeal. Prior attempts by the IBT to appeal from orders of the district court facilitating the implementation of the Consent Decree have been dismissed. See United States v. International Bhd. of Teamsters, No. 89-6252 (2d Cir. Dec. 13, 1989) (unpublished summary order); United States v. International Bhd. of Teamsters, No. 89-6254 (2d Cir. Dec. 13, 1989) (same). However, we find it unnecessary to resolve the issue of the IBT's right to appeal from the March 1990 order at this time because the IBT raises no fundamental claim that Friedman and Hughes have not already advanced, although the IBT may cast its arguments in slightly different terms. Therefore, we will assume only for the purpose of the present appeals that the arguments of the IBT are properly before us.
 
 B. Standard of Review
 
 24
 Although we conclude that we have jurisdiction to entertain the present appeals, the question remains of the scope of our review. Under the circumstances of this case, we have no doubt that the Administrator's decisions are entitled to great deference. See Foreman v. Wood, Wire & Metal Lathers Int'l Union, 557 F.2d 988, 992 (2d Cir.1977) (scope of appellate review of decision of administrator appointed pursuant to settlement agreement similar to deferential standard applied to arbitrator's decisions). We note that the parties have expressly incorporated into the Consent Decree a highly deferential standard of review. Paragraph 12(A) of the Consent Decree states that the Administrator shall preside at disciplinary hearings "conducted under the rules and procedures generally applicable to labor arbitration hearings" and shall "decide such cases using a 'just cause' standard." In addition, that paragraph states that "[a]ny decision of the Administrator shall be final and binding," subject to the review of the district court. Paragraph 16 of the Consent Decree further provides that:
 
 
 25
 In reviewing actions of the Administrator, the Court shall apply the same standard of review applicable to review of final federal agency action under the Administrative Procedure Act.
 
 
 26
 This language, as the context makes clear, refers to review of the Administrator's actions by the district court. It may well be that the district court's decisions implementing the Consent Decree are entitled to the same deference as those of the Administrator. However, we need not address further the intricacies flowing from the different levels of review. The district court appropriately accorded great deference to the Administrator in upholding his decisions, and we think, under any reasonable standard of review applied by us to the issues raised in this court, the district court's orders must be sustained.
 
 
 27
 II. Common Claims of Appellants IBT, Friedman and Hughes
 
 A. The Resolution
 
 28
 The Resolution was passed at a special meeting of the GEB on November 1, 1989, after the Administrator had decided that he had authority to proceed against Friedman and Hughes on the charges against them but before the district court had decided that issue. The Resolution was passed without notice to the Administrator and without provision by the IBT of an agenda in advance as required by the Consent Decree. This conduct is apparently the subject of a dispute, presently under consideration by the district court, over whether the discussions at the GEB November 1989 meeting were protected from disclosure to the Administrator by the attorney-client privilege. The Resolution was passed at the request of at least one member of the GEB, IBT Vice President Theodore Cozza, who was himself charged with conducting himself so as "to bring reproach upon" the IBT "by knowingly associating with associates of La Cosa Nostra."
 
 
 29
 The Resolution purported to interpret two portions of the IBT Constitution: Article II, section 2(a), see note 1, and Article XIX, section 3(d). The text of the latter is reproduced in the margin.[2] The Resolution first provided that the phrase "to bring reproach upon the Union" of Article II, section 2(a), was unduly vague and thus must be limited in application to the more specific provisions of Article XIX, sections 6(b)(3)-(7), reproduced in the margin.[3] In addition, the Resolution stated that the "reproach" provision was never intended to "cover associations between union members or officers with other persons inside or outside the trade union movement based upon the reputation or reputed activities of such other persons, absent any proof of participation or association with such persons" in conduct violating the more specific provisions of Article XIX, sections 6(b)(3)-(7). See note 3. Finally, the Resolution provided that the term "known generally" in Article XIX, section 3(d), see note 2, does not require an officer's admission of wrongful activities or actions, because to so interpret such language "would make it possible to set aside the will of the membership which elected such officer when it was known generally by the membership of such allegations."
 
 
 30
 The Resolution, if binding, would presumably bar Charge I against Friedman and Hughes, since the Resolution silently repeals sections 6(b)(1) and (2) of Article XIX, see note 3, and the latter recognizes violation of the oath of loyalty as a basis for disciplinary charges. Moreover, since both Friedman and Hughes were re-elected to their union posts in 1987, presumably after the allegations in their 1986 indictments became "known generally" to the IBT membership, the Resolution's interpretation of Article XIX, section 3(d), would also independently bar Charge I.
 
 
 31
 Appellants argue that the Administrator was without authority to override the Resolution and further that the Resolution provided a reasonable interpretation of relevant disciplinary provisions of the IBT Constitution.
 
 
 32
 1. The Administrator's Authority. Appellants argue that the delegation of specific disciplinary powers to the Administrator in the Consent Decree did not include the GEB's power to interpret the IBT Constitution. The Administrator derived his authority to review the Resolution and to interpret the IBT Constitution as related to disciplinary matters from the powers granted to him under paragraph 12(A) of the Consent Decree. That paragraph provides, in relevant part, that the Administrator
 
 
 33
 shall have the same rights and powers as the IBT's General President and/or General Executive Board under the IBT's Constitution (including Articles VI and XIX thereof) and Title 29 of the United States Code to discharge those duties which relate to: disciplining corrupt or dishonest officers, agents, employees or members of the IBT or any of its affiliated entities (such as IBT Locals, Joint Councils and Area Conferences), and appointing temporary trustees to run the affairs of any such affiliated entities.
 
 Paragraph 12(A) further provides:
 
 34
 As to decisions of the IBT General Executive Board on disciplinary charges and trusteeship proceedings during the Administrator's tenure, the Administrator shall review all such decisions, with the right to affirm, modify or reverse such decisions....
 
 
 35
 The Administrator considered his disciplinary powers under paragraph 12 of the Consent Decree to include a delegation of the interpretive authority of the General President and the GEB, as set forth in Article VI, section 2(a), and Article IX, section 1, of the IBT Constitution, insofar as he exercised that authority to interpret the disciplinary provisions of the IBT Constitution. Article VI, section 2(a), provides that the General President "shall have authority to interpret the Constitution and laws of the International Union ... and to decide all questions of law thereunder between meetings of the [GEB]," and Article IX, section 1, of the IBT Constitution provides that the GEB "shall have the authority to interpret and apply the Constitution and laws of the International Union and to decide all questions of law thereunder subject to appeal to the next Convention."
 
 
 36
 In his January 1990 opinion, the Administrator ruled that the Resolution did not bind him. In its March 1990 opinion, the district court upheld the Administrator's authority to override the GEB Resolution.
 
 
 37
 We agree that the Administrator had authority to disregard the Resolution. In determining the scope of the Administrator's authority, we turn to the explicit terms of the Consent Decree. See SEC v. Levine, 881 F.2d 1165, 1178-79 (2d Cir.1989). The disciplinary power vested in the Administrator by virtue of paragraph 12(A) of the Consent Decree, set forth above, plainly included the power to interpret the disciplinary provisions of the IBT Constitution. Appellants maintain, however, that Article IX, section 1, of the Constitution, grants the GEB exclusive authority to issue definitive interpretations of the Constitution, and that this authority was not modified by the Consent Decree in view of both the absence of any specific reference to the Administrator's interpretive power in the Consent Decree and the express reservation of rights contained in paragraph 18(a) of the Consent Decree. That paragraph states that "[e]xcept as provided by the terms of this order, nothing else herein shall be construed or interpreted as affecting or modifying ... the IBT Constitution."We are not persuaded that the IBT reserved the right to issue binding interpretations of the disciplinary provisions of its Constitution, in view of the express delegation contained in paragraph 12(A) of the Consent Decree, which grants the Administrator "the same rights and powers as the IBT's General President and/or General Executive Board under the IBT's Constitution (including Articles VI and XIX thereof)" to discharge disciplinary duties. Appellants would have us read the parenthetical phrase as confining the Administrator to the more limited interpretive powers set forth in Article VI, section 2(a), of the IBT Constitution, but the plain language of the Consent Decree does not permit such a restrictive reading. The Administrator's powers "includ[e]," but are not limited to, Articles VI and XIX. The Administrator's powers include as well the broader interpretive power authorized under Article IX, section 1, of the IBT Constitution insofar as the exercise of that power relates, as it does here, to disciplining corrupt or dishonest IBT or IBT-affiliated officers, agents, employees or members. As already indicated, Article IX, section 1, of the IBT Constitution vests the GEB with authority to "interpret and apply" the IBT Constitution and to "decide all questions of law thereunder." Moreover, the Administrator's comprehensive right to review disciplinary charges of the GEB necessarily includes the final authority to determine what constitutes an offense subject to discipline under the IBT Constitution.
 
 
 38
 2. Reasonableness of the Resolution. Appellants also argue that the Resolution is a reasonable interpretation of the IBT Constitution, and is thus binding on the Administrator and the courts, because federal case law recognizes a union's fundamental right to interpret its own constitution and requires judicial deference to that interpretation unless patently unreasonable. The Administrator rejected the GEB's constitutional interpretations as unreasonable, and the district court affirmed this ruling.
 
 
 39
 Even on the unlikely assumption that the GEB retained any independent authority to issue interpretations of the disciplinary provisions of the IBT Constitution, we conclude that the Resolution was entitled to no weight. The parties disagree over whether this court applies a "patently unreasonable" or a mere "unreasonable" standard to review of a union's interpretation of its Constitution. Appellants maintain, relying on Association of Contracting Plumbers, Inc. v. Local Union No. 2, United Ass'n of Journeymen and Apprentices of the Plumbing and Pipefitting Indus. of the United States and Can., 676 F.Supp. 523, 530 (S.D.N.Y.), aff'd, 841 F.2d 461 (2d Cir.1988), that this Circuit applies a patently unreasonable standard of review. The government contends, relying on Schonfeld v. Raftery, 359 F.Supp. 380, 388 (S.D.N.Y.1973), aff'd sub nom. Fritsch v. District Council No. 9, Bhd. of Painters, 493 F.2d 1061 (2d Cir.1974), that this court merely applies an unreasonableness standard. Under either standard, we reach the same result.
 
 
 40
 Appellants' arguments in defense of the reasonableness of the Resolution are not persuasive. The IBT attempts to sugarcoat the circumstances surrounding the Resolution, which was passed at a "special" meeting just one month after the Administrator had ruled against Friedman and Hughes on their various legal defenses to the charges against them and while the district court was considering the matter. The IBT also attempts to minimize the Resolution's likely effects, while Friedman and Hughes recognize the exculpatory nature of the Resolution but maintain that this fact is irrelevant, even as they attempt to benefit by it. Appellants ask this court not only to disregard the exculpatory character of the Resolution, which would bar pending charges against current and former GEB members, but also to ignore the fact that the Resolution was precipitated by a request from at least one charged IBT officer. This we decline to do. Cf. Morrissey v. Curran, 423 F.2d 393, 400 (2d Cir.) (exculpatory amendment to union constitution declared void), cert. denied, 399 U.S. 928, 90 S.Ct. 2245, 26 L.Ed.2d 796 (1970).
 
 
 41
 Moreover, the passage of the Resolution apparently violated the IBT's obligations under paragraph 17 of the Consent Decree, which expressly provides that the IBT must seek approval prior to making any changes in the areas covered by the Consent Decree:
 
 
 42
 The parties intend the provisions set forth herein to govern future IBT practices in those areas. To the extent the IBT wishes to make any changes, constitutional or otherwise, in those provisions, the IBT shall give prior written notice to [the government]....
 
 
 43
 The IBT maintains, however, that the requirement of paragraph 17 refers solely to changes that it might propose to the Consent Decree, and does not affect the IBT's right to interpret its Constitution. This argument ignores the fact, as the district court noted, that this paragraph specifically requires the IBT to refrain from any unilateral changes, "constitutional or otherwise," in the broad areas covered by the Consent Decree. Paragraph 17 was obviously intended to protect the background understanding of both parties of what existing rules, regulations and constitutional provisions would govern the IBT.
 
 
 44
 We agree with the district court that the "significant alterations" attempted by the Resolution "in the offenses which constitute violations of the IBT Constitution are major changes in the governing rules of the IBT," and would effectively nullify the Administrator's powers in disciplinary matters.
 
 III. Common Arguments of Friedman and Hughes
 A. Constitution as Bar
 
 45
 In addition to relying on the effect of the Resolution, appellants Friedman and Hughes argue that the IBT Constitution bars the Administrator from hearing Charge I. Friedman and Hughes make three specific arguments. The first repeats the construction of Article XIX, section 3(d), of the IBT Constitution adopted in the Resolution. Under section 3(d), an IBT officer cannot be subject to discipline for alleged pre-election misconduct, unless the allegations were not "known generally" by the membership of the IBT Local. Friedman and Hughes maintain that as a result of their well-publicized criminal indictments in 1986, their alleged wrongdoing was "known generally" prior to their re-election in 1987. Appellants' second argument is that under Article XIX, section 6(a), of the IBT Constitution, an IBT officer cannot be subject to disciplinary hearings for conduct arising from a criminal conviction while the criminal appeal is pending. Finally, Friedman and Hughes maintain that the same section contains a one-year statute of limitations that bars the instant charges.
 
 
 46
 With regard to the first contention, the Administrator held that Article XIX, section 3(d), by its explicit terms, precludes disciplinary charges only for generally known pre-election activity, not mere allegations, and the district court agreed. The theory of these holdings was that because Friedman and Hughes were, at the start of their terms, vigorously denying that they had engaged in the "activities and actions" for which they were indicted (and subsequently convicted), they could not credibly claim that their criminal activity was "known generally." With regard to the second contention, the Administrator and the district court held that paragraph 6 of the Consent Decree expressly authorizes the General President or the GEB to suspend officers during the pendency of civil or criminal charges, and the Administrator possesses these same disciplinary powers. As to the third contention, the Administrator and the district court ruled that the plain language of paragraph 5 of the Consent Decree eliminates any limitations period for disciplinary charges brought by the Investigations Officer and tried before the Administrator.
 
 
 47
 In each of these instances, taking into account the great deference to be given to the Administrator's rulings, we cannot say that the district court erred.
 
 B. Collateral Estoppel
 
 48
 Friedman and Hughes next argue that the district court erred in allowing the Administrator to collaterally estop them from contesting issues determined adversely to them in the Ohio criminal case, in view of the pendency of the criminal appeals there. Citing Parklane Hosiery Co. v. Shore, 439 U.S. 322, 330-31, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979), Friedman also argues that Hughes's unavailability to testify on Friedman's behalf in the prior criminal case made the Administrator's offensive use of collateral estoppel unfair.
 
 
 49
 We have recently pointed out that the pendency of a criminal appeal generally "does not deprive a judgment of its preclusive effect." See United States v. All Right, Title & Interest in Real Property & Building Known as 303 West 116th Street, 901 F.2d 288, 292 (2d Cir.1990); cf. Sherman v. Jacobson, 247 F.Supp. 261, 268 (S.D.N.Y.1965) (judgment may be final for purposes of collateral estoppel, despite the fact that an appeal from it has not been decided); Restatement (Second) of Judgments Sec. 13 comment g (1982) (same). As Judge Edelstein recognized, if the convictions of Friedman and Hughes are reversed by the Sixth Circuit, they may seek from him relief from the orders now under attack. Thus, the situation of riedman and Hughes is not akin to that presented to this court in Gelb v. Royal Globe Ins. Co., 798 F.2d 38 (2d Cir.1986), cert. denied, 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987), on which appellants rely. There this court refused to preclude relitigation of an issue on which plaintiff earlier had been denied effective appellate review. Id. at 45.
 
 
 50
 In addition, Parklane does not require a different result. There the Court recognized that the offensive use of collateral estoppel, whereby a defendant is foreclosed from relitigating an issue that he has previously litigated unsuccessfully in an action with another party, could, in some circumstances, be unfair to a defendant. Parklane, 439 U.S. at 330, 99 S.Ct. at 651. Such unfairness might result, the Court indicated, where a defendant had "little incentive to defend vigorously" in the first action; where "the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant"; or where "the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result." Id. at 330-31, 99 S.Ct. at 651.
 
 
 51
 None of these circumstances are present here. Friedman and Hughes had every incentive to litigate their criminal cases vigorously and there were no inconsistent judgments on the issues to which estoppel was applied. With regard to Hughes's failure to testify in the prior criminal case, it is true that he there exercised his Fifth Amendment right. Friedman claims that this prevented him from establishing his authorization defense, i.e., that the alleged "ghost employee" scheme was done at the direction of the FBI, and emphasizes that in view of Hughes's present willingness to testify on Friedman's behalf, the Administrator's refusal to allow him to do so was unfair. This court has recognized that "the application of collateral estoppel could result in unfairness if 'without fault of his own' a party against whom collateral estoppel is sought was deprived of 'crucial' evidence or witnesses in the prior action whose outcome is said to bar a subsequent action." United States v. United States Currency in the Amount of $228,536.00, 895 F.2d 908, 920 (2d Cir.1990) (quoting Blonder-Tongue Laboratories, Inc. v. University of Ill. Found., 402 U.S. 313, 333, 91 S.Ct. 1434, 1445, 28 L.Ed.2d 788 (1971)), cert. denied, --- U.S. ----, 110 S.Ct. 2564, 109 L.Ed.2d 747 (1990). Friedman, however, was not " 'without fault of his own,' " since he never moved to sever Hughes as a co-defendant in the prior criminal trial to facilitate obtaining in that forum his co-defendant's purportedly exculpatory testimony. Moreover, we note that the testimony of Hughes was received by the Administrator as "mitigation" evidence. The Administrator rejected the testimony as not credible, because, while Hughes testified that in his presence the late Jackie Presser told Friedman to hire one of the allegedly ghost employees because the FBI wanted it done, Friedman could not with any certainty recall that this conversation took place. Hughes's testimony, even if admitted as proof going to Friedman's authorization defense, would not therefore have "readily cause[d] a different result." Parklane, 439 U.S. at 331, 99 S.Ct. at 651.
 
 IV. Individual Claims of Friedman and Hughes
 A. Friedman
 
 52
 Friedman also argues that Charge II should be considered by us even though the Administrator has not yet ruled upon it, because the district court in its March 1990 opinion gave express permission to the Administrator to proceed with a disciplinary hearing on this charge. Friedman argues that Charge II is insufficient on its face for lack of requisite specificity in violation of the IBT Constitution, federal labor law and due process. Because Friedman has yet to be tried on this charge, his claim is premature and we decline to address it.
 
 B. Hughes
 
 53
 1. Binding Effect of Consent Decree on Nonparty. Hughes vigorously argues that because he was neither a party to the original lawsuit nor a signatory of the Consent Decree, he cannot be bound by it.[4] Quoting Coronado Coal Co. v. United Mine Workers of America, 268 U.S. 295, 304, 45 S.Ct. 551, 554, 69 L.Ed. 963 (1925), Hughes contends that the IBT cannot unilaterally change its Constitution, which constitutes the " 'fundamental agreement of association' " between the IBT and its affiliated local unions and members, and then make the new terms binding on them. This is so, Hughes maintains, because various provisions of the IBT Constitution explicitly reserve the power of amendment to the International Convention of the IBT, by vote of its duly elected delegates. Hughes also argues that application of the terms of the Consent Decree to him would violate due process, because, citing Martin v. Wilks, --- U.S. ----, 109 S.Ct. 2180, 2184 & n. 2, 104 L.Ed.2d 835 (1989), his interests were not adequately represented by those parties who, by entering into the Consent Decree, avoided substantial monetary penalties under the RICO forfeiture provisions. Hughes also argues that because the IBT and the GEB lacked the authority to amend the IBT Constitution, the purported amendments pursuant to the Consent Decree are void as to the affiliated locals and their members. He further contends that since the Consent Decree's amendment of the one-year statute of limitations contained in Article XIX, section 6(a), of the Constitution does not apply to him, the charges against him are time-barred.
 
 
 54
 These arguments are without merit. While we need not decide whether Hughes as a nonparty could be bound by each and every term of the Consent Decree, he clearly could be bound by the terms of the disciplinary mechanism set in place by the Consent Decree. This is so because the investigatory and disciplinary powers of the court-appointed officers are proper delegations of the powers of the IBT General President and the GEB within the scope of the IBT Constitution that binds all members of the IBT, and because the IBT Constitution, in Article XXVI, section 2, contemplates amendment by the GEB, under the circumstances of this case, as a result of judicial direction.[5]
 
 
 55
 In addition, Hughes's reliance on the Court's decision in Martin is inapposite, since the Consent Decree does not curtail any independent right of a member beyond what the IBT itself already had power to control, that is, a member's discipline under the IBT Constitution. In contrast, the nonparty firefighters in Martin, who challenged the consent decree there, asserted their independent right to be free from employment discrimination in violation of Title VII of the Civil Rights Act of 1964. See Martin, 109 S.Ct. at 2186 n. 6. In this case, Hughes was subject to disciplinary oversight both before and after the entry of the Consent Decree, and the IBT merely exercised its discretionary authority under the Constitution to delegate the investigation and discipline of union misconduct to the court-appointed officers.
 
 
 56
 2. Non-IBT Wrongdoing. Hughes also claims that he does not come within the ambit of any grant of authority to the Administrator under the Consent Decree, since his conviction in Ohio was not based upon any wrongdoing in connection with the IBT. This claim is also without merit. Although the disciplinary charges against Hughes are based upon his conviction for wrongdoing in relation to a non-IBT labor union, the Administrator could reasonably have concluded that the conviction of Hughes, an officer of an IBT Local, in connection with a scheme to embezzle the funds of a non-IBT labor union, brought reproach upon the IBT. In addition, Article XIX, section 6(b), of the IBT Constitution, see note 3, provides that "[t]he basis for charges against ... officers ... for which [they] ... shall stand trial shall consist of, but not be limited to" specified violations directly related to the IBT. Accordingly, the Administrator's decision to impose discipline was consistent with the IBT Constitution and his powers under the Consent Decree.
 
 
 57
 We have considered all of appellants' arguments and, for the reasons given above, the orders of the district court are affirmed.
 
 
 
 [1]
 Article II, section 2(a), provides in relevant part:
 Each person upon becoming a member thereby pledges his honor: to faithfully observe the Constitution and laws of the [IBT], and the Bylaws and laws of his Local Union ... [and] to conduct himself or herself at all times in such a manner as not to bring reproach upon the Union....
 (emphasis supplied).
 
 
 [2]
 Article XIX, section 3(d), provides in relevant part:
 Charges against elective officers of the International Union or any subordinate body shall be limited only to those activities or actions occurring during their current term of office, and only those activities and actions occurring prior to their current term which were not then known generally by the membership of the International Union or the subordinate body in the case of an officer of a subordinate body.
 (emphasis supplied).
 
 
 [3]
 Article XIX, section 6(b), provides:
 The basis for charges against members, officers, elected Business Agents, Local Unions, Joint Councils or other subordinate bodies for which he or it shall stand trial shall consist of, but not be limited to, the following:
 (1) Violation of any specific provision of the Constitution, Local Union Bylaws or rules of order, or failure to perform any of the duties specified thereunder.
 (2) Violation of oath of office or of the oath of loyalty to the Local Union and the International Union.
 (3) Embezzlement or conversion of union's funds or property.
 (4) Secession, or fostering the same.
 (5) Conduct which is disruptive of, interferes with, or induces others to disrupt or interfere with, the performance of any union's legal or contractual obligations. Causing or participating in an unauthorized strike or work stoppage.
 (6) Disruption of Union meetings, or assaulting or provoking assault on fellow members or officers, or failure to follow the rules of order or rulings of the presiding officer at meetings of the Local Union, or any similar conduct in, or about union premises or places used to conduct union business.
 (7) Crossing an authorized primary picket line established by the member's Local Union or any other subordinate body affiliated with the International Union.
 
 
 [4]
 The related issue of whether the Consent Decree has binding effect on IBT-affiliated nonparties is before this court in United States v. International Bhd. of Teamsters, No. 90-6038(L), and is scheduled to be heard the week of June 11, 1990. That appeal is from a January 17, 1990 opinion of Judge Edelstein, reported at 728 F.Supp. 1032, which held that the IBT subordinate entities (members, locals, joint councils, and area conferences) were bound by the Consent Decree, and which enjoined them from raising any challenges to that Decree in any forum other than the Southern District of New York
 
 
 [5]
 Article XXVI, section 2, provides, among other things, as follows:
 If any provision of this Constitution shall be declared invalid or inoperative by any competent authority of the executive, judicial or administrative branch of a state, provincial or federal government, the General Executive Board shall have the authority to suspend the operation of such provision during the period of its invalidity and to substitute in its place and stead a provision which will meet the objections to its validity and which will be in accord with the intent and purpose of the invalid provision.